1  Michael G. Marderosian, No. 077296
   Heather S. Cohen, No. 263093
2  MARDEROSIAN & COHEN
   1260 Fulton Mall
3  Fresno, CA 93721
   Telephone:  (559) 441-7991
4  Facsimile: (559) 441-8170

5  Virginia Gennaro, No. 138877
   City Attorney
6  CITY OF BAKERSFIELD
   1501 Truxtun Avenue
7  Bakersfield, CA  93301
   Telephone:  (661) 326-3721
8  Facsimile:  (661) 852-2020

9  Attorneys for:  Defendants CITY OF BAKERSFIELD, OFFICER VERION COLEMAN (sued
                   herein as OFFICER COLEMAN) and OFFICER ANTHONY McCARTHY (sued
10                 herein as OFFICER McCARTHY)

11
                   UNITED STATES DISTRICT COURT
12
                 EASTERN DISTRICT / FRESNO DIVISION
13

14  KENT WILLIAMS,                        )   Case No. 1:14-CV-01955-JLT
                                          )
15                Plaintiff,              )   **DECLARATION OF MICHAEL
                                          )   G. MARDEROSIAN IN SUPPORT
16          v.                            )   OF MOTION FOR SUMMARY
                                          )   JUDGMENT OR IN THE
17  CITY OF BAKERSFIELD, OFFICER          )   ALTERNATIVE, PARTIAL
    COLEMAN, OFFICER McCARTHY,            )   SUMMARY JUDGMENT**
18  and DOES 1 to 100, inclusive,         )
                                          )   **DATE: February 13, 2017
19                Defendants.             )   TIME: 9:30 a.m.
                                          )   LOCATION:
20                                        )   510 19th Street, Bakersfield, CA
                                          )   JUDGE: Hon. Jennifer L. Thurston**
21                                        )
                                          )   *Trial Date: May 2, 2017*
22  _____)

23        I, Michael G. Marderosian, hereby declare as follows:

24        1.      I am an attorney at law licensed to practice in all courts of the State of California and

25  am th attorney of record for Defendants City of Bakersfield, Officer Anthony McCarthy, and Officer

26  Verion Coleman.

27        2.      Attached hereto as Exhibit A is a true and correct copy of excerpts of the Deposition

28  of Kent Williams.

MARDEROSIAN & COHEN
1260 FULTON MALL
FRESNO, CA 93721

1    3.    Attached hereto as Exhibit B is a true and correct copy of excerpts of the Deposition

2    of Geraldine Kincaid.

3    4.    Attached hereto as Exhibit C is a true and correct copy of excerpts of the Deposition

4    of Eric Johnson.

5    5.    Attached hereto as Exhibit D is a true and correct copy of excerpts of the Deposition

6    of Royce Haislip.

7    6.    Attached hereto as Exhibit E is a true and correct copy of excerpts of the Deposition

8    of James Anton.

9    7.    Attached hereto as Exhibit F is a true and correct copy of excerpts of the Deposition

10    of Paul Coons.

11    8.    Attached hereto as Exhibit G is a true and correct copy of excerpts of the Deposition

12    of Verion Coleman.

13    9.    Attached hereto as Exhibit H is a true and correct copy of excerpts of the Deposition

14    of Anthony McCarthy.

15    10.    Attached hereto as Exhibit I is a true and correct copy of excerpts of the Deposition of

16    Joseph Grubbs.

17    11.    Attached hereto as Exhibit J is a true and correct copy of City of Bakersfield's

18    Responses to Request for Production of Documents, Set One.

19    12.    Attached hereto as Exhibit K is a true and correct copy of the Bakersfield Police

20    Department Property Receipt.

21    13.    Attached hereto as Exhibit L is a true and correct copy of Plaintiff's Responses to

22    Special Interrogatories, Set One, propounded by Defendant City of Bakersfield.

23    I declare under penalty of perjury under the laws of the State of California that the foregoing

24    is true and correct.  Executed on January 6, 2017, at Fresno, California.

25

26    _/s/ Michael G. Marderosian_
     MICHAEL G. MARDEROSIAN

27

28

# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT - FRESNO DIVISION

_____

KENT WILLIAMS,                )

                                  )

                Plaintiff,     )      Case No.

                                  )

        vs.                )   1:14-CV-01955-JLT

                                  )

CITY OF BAKERSFIELD,     )

OFFICER COLEMAN, OFFICER   )

McCARTHY, and DOES 1 to    )

100, inclusive,        )

                                  )

               Defendants.    )

_____)

DEPOSITION OF:

KENT WILLIAMS

FRIDAY, APRIL 22, 2016

9:10 A.M.

Reported By:  Sylvia Mendez, CSR No. 7636, RPR

1     Q.  All right.  When did you start care with

2  Karen Page?

3     A.  Probably a couple weeks after the incident

4  took place.

5     Q.  And "the incident" is the issue at the school

6  with your gun --

7     A.  On August 28, yes.

8     Q.  -- and the police officers; right?

9     August 28, 2014?

10     MS. TRUJILLO:  And you're doing a good job.

11  Just let him finish his whole question.

12     THE WITNESS:  Okay.  Sorry.

13     MS. TRUJILLO:  That's okay.

14  BY MR. MARDEROSIAN:

15     Q.  Let me ask you:  Prior to August 28, 2014,

16  you were under the care of a psychologist or mental

17  health care provider; is that correct?

18     A.  Yes.

19     Q.  There was some issues of suicide watch and

20  that type of thing.

21     Is that -- is that an accurate statement?

22     A.  No.

23     Q.  Okay.  Let's start with the -- the nature of

24  the psychological or mental health care that you were

25  receiving before August 28, 2014.

1          Tell me about that history.  How far back
2    does it go?  Who was the doctor?  What was the nature
3    of the treatment?
4          A.  Well, I saw Dr. Ma prior to the incident.
5          Q.  M-a?
6          A.  M-a.
7          Q.  Is that a psychologist or health --
8          A.  Psychiatrist.
9          Q.  Here's in the Bakersfield area?
10         A.  Yes.
11         Q.  So Dr. Ma is a medical doctor, a
12   psychiatrist?
13         A.  Yes.
14         Q.  And is that a man or a woman?
15         A.  It's a man.
16         Q.  Okay.  And was that the first time you had
17   ever seen a psychiatrist?
18         A.  No.
19         Q.  Okay.  So let's start with Dr. Ma, then.
20   Tell me about the history with Dr. Ma.  When did it
21   begin?
22         A.  I would estimate probably a year prior to
23   August 28.
24         Q.  So we'll call it August 2013, roughly?
25         A.  Roughly.

1      Q.  Why did you go see him?  Were you referred to
2  him by a personal physician or --
3      A.  Yes, I was.
4      Q.  And who was your personal physician?
5      A.  Dr. Kothary.
6      Q.  How do you spell that?
7      A.  K-o-t-h-a-r-y.
8      Q.  And what was the reason Dr. Kothary referred
9  you to Dr. Ma?
10     A.  For anxiety.
11     Q.  And when you say "anxiety," how did it
12  manifest itself, meaning was there just general
13  depression? were there thoughts of self-imposed harm?
14  How would you -- how would you describe it?
15     A.  Just nervousness throughout the day.
16     Q.  Okay.  And so you fell under the care of
17  Dr. Ma?
18     A.  Yes.
19     Q.  And this led up to the time of the incident
20  on August 28?
21     A.  Yes.
22     Q.  And were you under medication, as well?
23     A.  Yes.
24     Q.  And what type of medication?
25     A.  Prior to the incident?

```
1        Q.   I'm now only talking to the incident of
2   August 28 --
3        A.   Okay.
4        Q.   -- 2014.
5        A.   I was taking Paxil.
6        Q.   That's an anxiety medication?
7        A.   Yes.
8        Q.   Anything else?
9        A.   Not that I can remember.
10       Q.   I'm, obviously, not a doctor.  We're going to
11  have to subpoena the records of Dr. Ma and Dr. Kothary.
12            And that's K-o-t-h-a-r-y?
13       A.   Yes.
14       Q.   And is that a man or a woman?
15       A.   Man.
16       Q.   And that's in Bakersfield here, as well?
17       A.   Yes.
18       Q.   But anxiety could be in the form of paranoia,
19  as well.
20            Was that one of the features of your anxiety?
21       A.   No.
22       Q.   So if I subpoena these records, it wouldn't
23  talk about issues that you expressed regarding feeling
24  paranoid or anxious about someone harming you or
25  anything like that?
```

1   A. No.

2   Q. Okay. How would you describe what the issue

3 was, then, when you would speak to Dr. Ma? What were

4 your fears and concerns that was part of the anxiety?

5   A. Primarily, nervousness at the workplace.

6   Q. Your anxiety and nervousness at the

7 workplace, that was the reason why you were seeing a

8 psychiatrist?

9   A. Yes.

10   Q. Okay. And so that lasted about a year with

11 Dr. Ma?

12   A. Approximately, yes.

13   Q. And are you -- you're no longer being treated

14 by Dr. Ma?

15   A. Yes, I am.

16   Q. Oh, okay.

17   So that's continuing to this day?

18   A. Yes.

19   Q. And in addition to Dr. Ma, you're seeing a

20 health care provider -- mental health care provider,

21 Mrs. Page?

22   A. No longer seeing her.

23   Q. Okay. No longer seeing Karen Page?

24   A. No.

25   Q. How were you referred to Karen Page? Do you

1   remember how that came about?

     2        A.  I don't remember.

     3        Q.  And Karen Page is here in Bakersfield, as

     4   well?

     5        A.  Yes.

     6        Q.  Yes, okay.

     7            Did you discuss with them that you had a

     8   license to carry a concealed weapon?

     9        A.  Not prior to the incident, no.

    10        Q.  Okay.  Did you have a license to carry a

    11   concealed weapon prior to the incident?

    12        A.  Yes, I did.

    13        Q.  How long had you had that?

    14        A.  I received it in December of 2013.

    15        Q.  Why -- why did you seek to obtain a permit to

    16   carry a concealed weapon?

    17        A.  I wanted to protect myself and my family.

    18        Q.  Against what?

    19        A.  Anybody with ill intentions against me or my

    20   family.

    21        Q.  Was there any issue like that going on?

    22   Had anyone threatened you?

    23        A.  No.

    24        Q.  Okay.  It was just from information in the

    25   news, things happening at the schoolyard, at schools --

1    things happening everywhere?

2         A.   Right.

3         Q.   That was it?

4         A.   Correct.

5         Q.   So you felt the need to always have a gun on

6    you; is that correct?

7         A.   Not always, but majority of the time.

8         Q.   In the police report, I take it you've

9    reviewed the police report that was prepared in this

10   case by Officer Coleman?

11        A.   No, I haven't.

12        Q.   Okay.  In one part of the report, he states

13   that -- and I'll just read it to you:

14             "Gerrie Kincaid, the Assistant

15        Superintendent, received information that you

16        might be in possession of a firearm," and it

17        states:

18             "Kincaid stated an administrator from the

19        School District, Randy Miller --"

20             You know Mr. Miller, I take it?

21        A.   Yes.

22        Q.   "-- advised her that an unidentified teacher

23        talked with him this morning.  Miller stated the

24        unidentified teacher stated," quote, "'A couple

25        of weeks ago, he or she had training with

1    Williams.'  The unidentified teacher stated,
 2    'During a break in the class, Williams showed
 3    him/her a loaded firearm that he had in his
 4    backpack.  The unidentified teacher stated that
 5    Williams told him or her that he always has his
 6    gun with him and that he,'" quote, "'will get
 7    them before they get him,' possible talking about
 8    active shooters."
 9         Do you remember an incident like that,
10    talking with a teacher and making a statement like
11    that?
12         A.  Yes.
13         Q.  Okay.  Who was the teacher that's being
14    referred to here?
15         A.  Eric Johnson.
16         Q.  And he was a fellow teacher at the Tevis
17    School with you?
18         A.  No, he wasn't.
19         Q.  Who is Eric Johnson?
20         A.  He's a teacher at the Opportunity class.
21         Q.  Is it on the same campus?
22         A.  No.
23         Q.  Okay.  Different campus.
24              The school that you were at, is that called
25    "Tevis"?

1     A. "Tevis."

2     Q. And Mr. Johnson was a teacher at Opportunity?

3     A. Yes.

4     Q. Here in Bakersfield?

5     A. Yes.

6     Q. He's a friend of yours?

7     A. Yes, he was.

8     Q. I see.

9     And would you go to gun classes together or

10 shooting ranges together?

11    A. No.

12    Q. Oh, had you had some training with

13 Mr. Johnson?

14    A. No, I didn't.

15    Q. Says that "he had training with Williams."

16    Do you know what's being referred to by

17 Officer Coleman?

18    A. That's a false statement.

19    Q. Okay. So there's no training involved

20 between you and Mr. Johnson?

21    A. No.

22    Q. But the statement that you showed Mr. Johnson

23 the gun, your gun, and made this statement, "We'll get

24 them before they get --" "We'll get them before they

25 get him," that's a true statement?

1           A.   Yes.

        2           Q.   Okay.  And you displayed, you showed him the

        3    gun there at Tevis?

        4           A.   "Tevis."

        5           Q.   "Tevis."  I'll get it.  I'll mispronounce it

        6    100 times before I get it.

        7           A.   That's all right.

        8           Q.   Sylvia knows that about me.

        9           A.   Short vowel.

        10          Q.   That's going to complicate it more now.

        11               So tell me about the circumstances.  You were

        12   just talking, and you showed him the gun, or what was

        13   the deal there?

        14          A.   Yes.  We were just talking, and I just

        15   recently obtained my CCW, and I considered him a close

        16   friend and showed him the gun.

        17          Q.   Okay.  And this was when you were in your

        18   classroom?

        19          A.   In my office.

        20          Q.   In your office.  Okay.

        21               Did you ever -- you had a classroom; right?

        22          A.   No.

        23          Q.   You were a teacher?  No.  You were an

        24   administrator?

        25          A.   Administrator, yes.

1          Q.   Because you were the Assistant Principal at
     2     Tevis; correct?
     3          A.   Yes.
     4          Q.   And how long had you been the
     5     Assistant Principal there?
     6          A.   Five years.
     7          Q.   Okay.  All right.
     8               Did the School District know that you were
     9     under psychiatric care?
    10          A.   No.
    11          Q.   Okay.  When you applied for your license,
    12     the concealed weapon, did you inform the -- whom did
    13     you get it from?  The PD, Police Department?
    14          A.   Kern County Sheriff's Department.
    15          Q.   Did you inform them that you were under
    16     psychiatric care?
    17          A.   No, I didn't.
    18          Q.   Wasn't that required by the information that
    19     was needed for the concealed weapons permit?
    20          A.   Not that I'm aware of.
    21          Q.   You filled out some paperwork, though; right?
    22          A.   Yes.
    23          Q.   Did you know that the School District, the
    24     Panama-Buena Vista Union School District, of which
    25     Tevis is a part of, had a gun-free zone policy?

Were you aware of that?

    A.  No, I wasn't.

    Q.  I take it you're aware of it now; correct?

    A.  Yes.

    Q.  Let me ask you, Mr. Williams.  I mean -- and I don't mean any disrespect about this at all, but I want to get a feel for how you see things in the world around you:

        You've had a history of psychiatric care for anxiety prior to the time you got your permit; correct?

    A.  Yes.

    Q.  You got the permit.  You would take a loaded pistol, a Glock pistol, to school with you when you went to work every day; correct?

    A.  Nearly every day, yes.

    Q.  And you did not inform your supervisors at the School District that you were doing that?

    A.  No, I didn't.

    Q.  All right.  And they didn't know about the psychiatric care, either?

    A.  No.

    Q.  And so when Mr. Johnson, apparently, reported seeing the gun, you do admit you showed him the gun; right?

    A.  Yes.

```
 1   right?
 2        A.  Yes.
 3        Q.  The fact that the School District reacted the
 4   way they did by contacting the police, you felt that
 5   was unreasonable?
 6        A.  Yes.
 7        Q.  And do you fault -- do you fault the police
 8   for coming and inquiring with you about this reported
 9   gun?
10        MS. TRUJILLO:  Objection.  Calls for
11   speculation; lacks foundation; also calls for a legal
12   conclusion.
13        Go ahead.
14        THE WITNESS:  No.
15   BY MR. MARDEROSIAN:
16        Q.  And what is it that you fault the police for,
17   if anything?
18        A.  For unlawfully arresting me.
19        Q.  Okay.  And had you ever been arrested before?
20        A.  No, sir.
21        Q.  Okay.  Had you had any problems with the law
22   before?
23        A.  No.
24        Q.  So you don't fault the police for responding
25   and investigating this, but you fault them for formally
```

```
 1   placing you under arrest and taking you to jail;
 2   correct?
 3        A.  Yes.
 4        Q.  Were you incarcerated?
 5        A.  Yes.
 6        Q.  For how long?
 7        A.  Approximately six hours.
 8        Q.  And then did you bail out, or were you
 9   released on your own recognizance?
10        A.  I was released.
11        Q.  And no charges were ever filed; correct?
12        A.  Correct.
13        Q.  And in terms of their treatment of you, do
14   you fault the police in terms of how they treated you
15   physically?  Did they do anything physically that
16   you're complaining about?
17        A.  Yes.
18        Q.  What did they do?
19        A.  They illegally searched me.
20        Q.  All right.  There at the school?
21        A.  Yes.
22        Q.  They patted you down?
23        A.  Yes.
24        Q.  Any body cavity searches at all?
25        A.  No.
```

```
 1        Q.   Okay.   So they patted you down?

 2        A.   Yes.

 3        Q.   They handcuffed you at some point?

 4        A.   Yes.

 5        Q.   They put you in a car?

 6        A.   Yes.

 7        Q.   Was there anything out of the ordinary about

 8   that, other than, obviously, nobody likes to be

 9   restrained or arrested.   But did they hit you, kick

10   you, or do anything that caused you any bruising or

11   anything like that?

12        A.   No.

13        Q.   So it's the fact that they arrested you --

14   detained you and arrested you when you felt they had

15   no legal right to do so?

16        A.   Correct.

17        Q.   Is there anything else that the police did

18   that you are unhappy about or feel was unreasonable?

19        A.   Yes.

20        Q.   What is that?

21        A.   They transport -- transported me to

22   Kern Medical Center, handcuffed and paraded me through

23   the hospital, when it was unnecessary.

24        Q.   Okay.   Why was it unnecessary?

25        A.   Because I hadn't broken the law.
```

A.  No.

      Q.  -- that was all resolved; correct?

      A.  Yes.

      Q.  Are there any other lawsuits that you have
pending other than this lawsuit against the City that
we're talking about today?

      A.  No, I don't.

      Q.  Now, in this report, the police report, it
indicates:

            "I made contact with Kincaid, who arrived at
      the school.  They stated the District never gave
      Williams permission to carry a firearm on school
      grounds --"

            So that's a correct statement; right?
You never had permission from the School District to
have this gun present on school grounds?

      A.  No, I didn't.

      Q.  Okay.

            "-- and he never requested it."

            That's an accurate statement, as well; right?

      A.  Correct.

      Q.  Okay.

            "I made contact with the Principal,
      identified as Paul Kuhn.  He stated he was
      concerned for Williams' safety because," quote,

1       "'last Wednesday,'" end of quote, "Williams told
2       him he was on suicide watch after having a rough
3       day.  Kuhn stated Williams told him that he was
4       starting counseling again for depression because
5       he is messed up in the head --" quote, "'messed
6       up in the head,'" end of quote.
7            Is any of that true, sir?
8       A.  Yes, I did make that remark, but I said it in
9  a joking manner.
10      Q.  Okay.  But you told Principal Kuhn that you
11 were on suicide watch?
12      A.  Something to that effect.
13      Q.  And that you were messed up in the head?
14      A.  I don't remember saying that.
15      Q.  Did you know that this information was
16 reported to the police before they arrested you?
17      A.  No, I didn't.
18      Q.  Is there a reason why you have never read the
19 police report in this case?
20      A.  I don't remember getting a copy of it.
21      Q.  Okay.  And then they said -- Officer Coleman
22 reported:
23           "I asked Williams if he would verbally
24      consent to us seizing the remaining six firearms
25      that he has at his residence for safekeeping,

```
 1        which he stated," quote, "'Absolutely.  I totally
 2        understand,'" end of quote.
 3            Did you make that statement to the police
 4   officers?
 5        A.  No, sir, I didn't.
 6        Q.  They indicate in this report that you gave
 7   them consent to go to your home and acquire the other
 8   six firearms that are there.
 9            Are you aware of that, that's what the
10   officers are saying?
11        A.  Yes.
12        Q.  And you're disputing that; you're saying
13   that's not true?
14        A.  No, I'm not.
15        Q.  No, you're not what?
16        A.  I'm not disputing that.
17        Q.  Okay.  So you did tell them it was okay to go
18   to your home to get those guns?
19        A.  Yeah.  I just didn't use that language.
20        Q.  Oh, okay.  What language did you use?
21        A.  Well, I felt I didn't have a choice.  And so
22   I just agreed for them to go to my -- my house.  But I
23   didn't say, "Absolutely, I understand."
24        Q.  Okay.  But you did give them consent to go
25   there?
```

```
 1        A.   Yes.

 2        Q.   And it was freely given, voluntarily given?

 3        A.   Yes.

 4        Q.   Prior to seeing Dr. Ma, what history had you

 5   had of any psychiatric or psychological counseling or

 6   treatment?

 7        A.   Very similar:  stress, anxiety.

 8        Q.   Were you ever in the military?

 9        A.   No.

10        Q.   Okay.  Did you grow up here in the

11   Bakersfield area?

12        A.   Yes, I did.

13        Q.   Okay.  What other psychologists or

14   psychiatrists had you seen prior to Dr. Ma?

15        A.   I don't recall his name.

16        Q.   When did you -- give me some idea when you

17   first started to receive psychological or psychiatric

18   care.  How old were you?

19        A.   I would say probably two years prior to

20   seeing Dr. Ma.

21        Q.   Okay.  And were you having issues with your

22   marriage, as well?  Was that part of this process?

23        A.   No.

24        Q.   Okay.  The anxiety was coming from what

25   source?  Just your work?
```

1      Q.   Now, you had two magazines of bullets in the
2  backpack, as well; correct?
3      A.   No.
4      Q.   How many?
5      A.   Just one.
6      Q.   And was it engaged in the pistol?
7      A.   Yes.
8      Q.   All right.  So the pistol was locked and
9  loaded, then?
10     A.   Yes.  But there wasn't one in the chamber.
11     Q.   Okay.  And so when the officers approached,
12 they didn't approach with their own pistols drawn,
13 did they?
14     A.   No, they didn't.
15     Q.   Were they polite and reasonable in their
16 discussions with you, sir?
17     A.   Yes.
18     Q.   Did they, in any way, threaten you at all?
19     A.   No.
20     Q.   Did they, in any way, get in your face and
21 try to intimidate you at all?
22     A.   No.
23     Q.   It was a discussion over this issue about
24 your possession of this weapon, this gun?
25     A.   Yes.

1      Q.   Did they, in any way, try to coerce or
2  threaten or intimidate you in any way?
3      A.   No.
4      Q.   Was there a dispute in the discussion between
5  you and the officers?  Were you trying to tell them
6  that "This was okay," and were they trying to say,
7  "It wasn't okay" -- anything like that at all?
8      A.   Yes.
9      Q.   What did you tell them?
10     A.   I told them I had researched the CCW laws,
11 and that it was okay for me to carry it on school
12 grounds.
13     Q.   And did you research the School District
14 Rules and Regulations?
15     A.   Yes, I did.
16     Q.   So you knew it wasn't authorized by the
17 school regulations; right?
18     A.   No.  I could not find anything relating to
19 guns in the School Board.
20     Q.   You do know now that it did exist; right?
21     A.   Yes, I did.
22     Q.   Just so we're clear:  You learned after the
23 incident -- well, let me ask you:
24          At the time of the incident on August 28 or
25 prior to that, did you know that possession of an

1 in writing that you ever informed anybody, within the

2 School District, that you had this gun?

3     A.  No.

4     Q.  Do you think that -- I read the report on how

5 it was reported on August 28, 2014, that you had this

6 gun and how the police got involved in this.

7         Do you believe that was politically

8 motivated, somebody trying to cause you harm within the

9 School District?

10        MS. TRUJILLO:  Objection.  Calls for

11 speculation; lacks foundation.

12        Go ahead.

13        THE WITNESS:  No, I wouldn't know.

14 BY MR. MARDEROSIAN:

15     Q.  Okay.  But you don't -- you don't blame the

16 police for responding to this call; correct?

17     A.  Correct.

18     Q.  You blame the police for placing you under

19 arrest when you believe that the law did not prohibit

20 you from having this gun on this campus?

21     A.  That's correct.

22     Q.  You don't fault the police for how they went

23 about -- the physical component of how they went about

24 arresting you and transporting you to jail; is that

25 correct?

A.   That's correct.
         Q.   It's the fact that they arrested you and
ultimately did not file any charge against you that you
fault them for?
         A.   Yes.
         Q.   Anything else?
         A.   Yes.
         Q.   What?
         A.   After they told me that I'd been released and
that I was free to go, they went ahead and booked me;
they took my mug shots and fingerprinted me after they
had already told me that I was free and hadn't broken
the law.
         Q.   Okay.  Anything else?
         A.   Not to my knowledge, no.
         Q.   Now, this information to Principal Kuhn --
              So Principal Kuhn became the Principal after
Machado; right?
         A.   Correct.
         Q.   How long had Principal Kuhn been the
Principal there at the school?
         A.   It was his first year.
         Q.   Okay.  Why would you joke with him about
"suicide watch" and "being messed up in the head" just
a few days before this incident?

STATE OF CALIFORNIA        )

                           )        ss.

COUNTY OF KERN             )


        I, Sylvia Mendez, a Certified Shorthand
Reporter in the State of California, holding
Certificate No. 7636, RPR, do hereby certify that
KENT WILLIAMS, the witness named in the foregoing
deposition, was by me duly sworn; that said deposition
was taken Friday, April 22, 2016, at the time and place
set forth on the second page hereof.
        That upon the taking of the deposition, the
words of the witness were written down by me in
stenotype and thereafter transcribed by computer under
my supervision; that the foregoing is a true and
correct transcript of the testimony given by the
witness.
        I further certify that I am neither counsel
for, nor in any way related to any party to said
action, nor in any way interested in the result or
outcome thereof.
        Dated this ^th day of ^, 2016, at
Bakersfield, California.


                        _____

                        Sylvia Mendez, CSR No. 7636, RPR

EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT/FRESNO DIVISION

———————————

KENT WILLIAMS,                          )
                                        )
          Plaintiff,                    )
                                        )
      vs.                               ) No. 1:14-CV-01955-JLT
                                        )
CITY OF BAKERSFIELD, OFFICER            )
COLEMAN, OFFICER McCARTHY,              )
and DOES 1 to 100, inclusive,          )
                                        )
          Defendants.                   )
_____)

VIDEOTAPED DEPOSITION

OF

GERALDINE KINCAID

Friday, June 10, 2016

Bakersfield, California

Reported by:  Susan R. Wood, CSR No. 6829

10:33:25 1 this matter.

10:33:26 2       MR. MARDEROSIAN: Good morning. My name is

10:33:27 3 Mick Marderosian, and I represent the defendants the

10:33:29 4 City of Bakersfield, Officer Coleman and Officer

10:33:33 5 McCarthy in this action.

10:33:34 6       MR. PAI: Anil Pai on behalf of the

10:33:36 7 deponent, Gerrie Kincaid.

10:33:38 8       VIDEO OPERATOR: Thank you. Would the court

10:33:40 9 reporter please swear in the witness.

10:33:40 10                GERALDINE KINCAID,

10:33:40 11 called as a witness by counsel for Defendants, being

10:33:40 12 first duly sworn, testified as follows:

10:33:51 13                EXAMINATION

10:33:51 14 BY MR. MARDEROSIAN:

10:33:51 15    Q. Good morning. Could you please give us your

10:33:53 16 name for the record, please.

10:33:54 17    A. My name is Geraldine Kincaid.

10:33:58 18    Q. And what is your business address?

10:34:02 19    A. My business address is 4200 Ashe Road,

10:34:06 20 Bakersfield, 93313.

10:34:08 21    Q. What is the nature of your business at that

10:34:13 22 location?

10:34:15 23    A. We're a school district. I work for the

10:34:17 24 Panama-Buena Vista Union School District.

10:34:20 25    Q. And what is the nature of your current

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

6

10:34:22  1  position with the school district?

10:34:23  2      A.  I am an assistant superintendent of

10:34:29  3  educational services.

10:34:34  4      Q.  Ms. Kincaid, my name is Mick Marderosian.

10:34:37  5  I'm an attorney for the City of Bakersfield in regard

10:34:40  6  to a lawsuit brought by Kent Williams, a former

10:34:43  7  employee of the Panama-Buena Vista Union School

10:34:48  8  District.  Do you recognize that name?

10:34:51  9      A.  Kent Williams?  Yes.

10:34:52  10     Q.  Yes.  And you know Mr. Williams.

10:34:53  11     A.  I know Mr. Williams.

10:34:56  12     Q.  And his attorney Chantal --

10:34:59  13         MS. TRUJILLO:  Trujillo.

10:35:01  14 BY MR. MARDEROSIAN:

10:35:01  15     Q.  -- Trujillo is here today representing his

10:35:03  16 interests.  I'm here today representing the interests

10:35:07  17 of the City of Bakersfield, who are being sued by

10:35:11  18 Mr. Williams, and we have subpoenaed you to come here

10:35:15  19 today in order to ask you some questions that may be

10:35:18  20 relevant or pertinent to his lawsuit; do you

10:35:21  21 understand that?

10:35:21  22     A.  I understand.

10:35:22  23     Q.  This process is called a deposition.  It

10:35:26  24 allows me and Ms. Trujillo to ask questions of you.

10:35:31  25 Your responses to those questions become what's

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

11

10:39:56　1　brought to his attention that were of concern.

10:39:59　2　　　Q.　One of which I think was he used to wear a

10:40:02　3　fedora to school and Mr. Coon didn't want him to wear

10:40:06　4　a fedora any longer.　Have you ever -- have you heard

10:40:10　5　that before?

10:40:10　6　　　A.　I wasn't -- I wasn't aware of that

10:40:13　7　particular issue.

10:40:13　8　　　Q.　All right.

10:40:14　9　　　A.　Um-hmm.

10:40:15　10　　　Q.　Meaning Mr. Williams never brought that to

10:40:17　11　your attention.

10:40:17　12　　　A.　No.

10:40:21　13　　　Q.　Okay.　All right.　Now, in regard to

10:40:30　14　policies, you mentioned that you were involved in the

10:40:34　15　development of board policies; is that correct?

10:40:37　16　　　A.　Yes.

10:40:38　17　　　Q.　Or at least you have knowledge of the board

10:40:41　18　policies.

10:40:41　19　　　A.　We review, yes.

10:40:43　20　　　Q.　And am I correct that at the time of the

10:40:44　21　subject incident, which occurred on August 28, 2014,

10:40:50　22　this school district, the Panama-Buena Vista Union

10:40:55　23　School District, had a board policy entitled a

10:40:57　24　gun-free school zone; is that correct?

10:40:59　25　　　A.　That's correct.

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

12

10:41:01 1      Q.  Which made possession of unauthorized

10:41:03 2  firearms, weapons, or other dangerous instruments

10:41:08 3  prohibited within 1,000 feet of the school grounds

10:41:11 4  without the permission of school authorities; is that

10:41:14 5  correct?

10:41:15 6      A.  That is correct.

10:41:16 7      Q.  And there was also a policy, Policy Number

10:41:23 8  5131.7, which referenced weapons and dangerous

10:41:30 9  instruments --

10:41:30 10     A.  The conduct policy.

10:41:30 11         THE REPORTER:  I'm sorry?

10:41:30 12         MR. MARDEROSIAN:  I'm sorry?

10:41:35 13         THE WITNESS:  It's referred to as the

10:41:36 14  conduct policy, I believe.

10:41:36 15  BY MR. MARDEROSIAN:

10:41:37 16     Q.  Okay.  And is that directed to students --

10:41:41 17     A.  Typically, yes.

10:41:42 18     Q.  -- specifically?

10:41:43 19     A.  Yes, um-hmm, it's generally directed towards

10:41:45 20  students.

10:41:45 21     Q.  But it also -- there is a paragraph in this

10:41:50 22  policy entitled Possession of Weapons and it states,

10:41:52 23  "The Board prohibits any person other than authorized

10:41:56 24  law enforcement or security personnel from possessing

10:42:01 25  weapons, imitation firearms, or dangerous instruments

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

13

| | | |
|---|---|---|
| 10:42:04 | 1 | of any kind in school buildings, on school grounds or |
| 10:42:08 | 2 | buses, at any school-related or school-sponsored |
| 10:42:12 | 3 | activities away from school, or while going to or |
| 10:42:16 | 4 | coming from school."  That was an existing policy as |
| 10:42:19 | 5 | of August 28, 2014, within the school district. |
| 10:42:23 | 6 |     A.  Yes. |
| 10:42:29 | 7 |     Q.  Now, in regard to Mr. Williams, prior to the |
| 10:42:33 | 8 | date of this incident, August 28, 2014, were you |
| 10:42:38 | 9 | involved in any employment-related issues or any |
| 10:42:42 | 10 | issues involving Mr. Williams? |
| 10:42:47 | 11 |     A.  They would have been informal issues, |
| 10:42:51 | 12 | concerns.  I have been in meetings with him, training |
| 10:42:53 | 13 | meetings with him and other assistant principals |
| 10:42:58 | 14 | where we address issues and concerns regarding |
| 10:43:02 | 15 | student behaviors, procedures, and policies. |
| 10:43:05 | 16 |     Q.  Okay.  What about in regard to his own |
| 10:43:08 | 17 | conduct, Mr. Williams, were you involved in any |
| 10:43:11 | 18 | issues regarding any complaints concerning his |
| 10:43:15 | 19 | conduct prior to August 28, 2014? |
| 10:43:25 | 20 |     A.  They -- he -- he would stop by my office and |
| 10:43:29 | 21 | sit down and talk to me and complain about his |
| 10:43:32 | 22 | supervisors at times. |
| 10:43:34 | 23 |     Q.  Okay.  I did note in reviewing the file that |
| 10:43:38 | 24 | there were issues of allegations of sexual harassment |
| 10:43:42 | 25 | by him in regard to at least one female employer; are |

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

20

10:51:34  1     A.  Yes.

10:51:36  2     Q.  -- responded?

10:51:36  3     A.  They responded before I got there, but when

10:51:39  4  I arrived that's who was there, Officer Coleman and

10:51:42  5  Officer McCarthy.

10:51:45  6     Q.  How did it come about that you learned that

10:51:48  7  Mr. Williams had a gun on campus?

10:51:51  8     A.  I received a call from a principal at our

10:51:55  9  opportunity site who also does a lot of work with our

10:51:59 10  assistant principals, and he called me because a

10:52:02 11  teacher at his site said that Kent Williams had

10:52:10 12  pulled him into his office one day when that teacher

10:52:14 13  had been a -- there for a training.

10:52:20 14     Q.  And that's Eric --

10:52:21 15     A.  Eric Johnson.

10:52:23 16     Q.  Eric Johnson.

10:52:24 17     A.  And I'm not sure I knew who that was at the

10:52:27 18  time when I made the call.  He told me that a teacher

10:52:30 19  said that Eric had shown him -- I mean that Kent

10:52:34 20  Williams had shown him a gun, and I'm not clear as to

10:52:40 21  when I knew it was Eric Johnson who was the reporting

10:52:43 22  teacher.

10:52:44 23     Q.  Okay.  But the person that you were speaking

10:52:46 24  to that reported this fact that Mr. Williams had a

10:52:51 25  gun on campus was a gentleman by the name of Randy

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

21

10:52:55 1 Miller; is that correct?

10:52:56 2     A.  That's correct.

10:52:56 3     Q.  And Mr. Miller is an administrator for the

10:53:01 4 school district?

10:53:02 5     A.  That's correct.

10:53:02 6     Q.  And where does -- does he work in the same

10:53:04 7 office building as you?

10:53:05 8     A.  No.  He works on Schirra Court where our

10:53:09 9 opportunity school program resides.

10:53:10 10     Q.  I see.

10:53:10 11     A.  Um-hmm.

10:53:11 12     Q.  And so you received a call from Mr. Miller.

10:53:15 13 He must have called your cell phone, I take it.

10:53:17 14     A.  He called my desk phone.

10:53:19 15     Q.  Your desk phone.  And you were at your desk

10:53:21 16 at the time?

10:53:22 17     A.  Correct.

10:53:22 18     Q.  And so you're now telling us as to what he

10:53:26 19 related to you.

10:53:28 20     A.  Correct.

10:53:29 21     Q.  And why don't you continue on with what

10:53:31 22 Mr. Miller told you that then I take it led you to

10:53:34 23 contact the police department.

10:53:36 24     A.  Yes.  He reported that he had been told

10:53:41 25 that -- well, he first of all stated that he believed

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

22

10:53:44 1 Kent Williams had a gun on campus and perhaps had

10:53:50 2 been possessing a gun on campus and that it was

10:53:53 3 reported to him that Kent displayed that gun to the

10:54:00 4 person who had informed him and that person was Eric

10:54:05 5 Johnson.

10:54:06 6     Q.  And were you also told that Mr. Williams had

10:54:10 7 been making unusual remarks and comments about his

10:54:15 8 mental health?  Did Mr. Miller say anything to you

10:54:18 9 about that?

10:54:19 10     A.  No.

10:54:20 11     Q.  Okay.  So I take it that you contacted the

10:54:29 12 police department because this information led you to

10:54:35 13 believe that Mr. Williams may be violating the board

10:54:38 14 policy that I recited earlier in your deposition.

10:54:41 15     A.  Well, my primary concern was that there was

10:54:43 16 a gun on campus.

10:54:54 17     Q.  And why was that a concern?

10:54:57 18     A.  Because we do not permit weapons on campus.

10:55:00 19     Q.  All right.  Pursuant to that board policy;

10:55:02 20 right?

10:55:02 21     A.  And -- yes.

10:55:05 22     Q.  Right.  I mean, there are obviously safety

10:55:06 23 issues involved.

10:55:07 24     A.  Yes.

10:55:08 25     Q.  I understand that.  We're going to address

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

23

10:55:10  1   that. But just in terms of the legality of

10:55:12  2   Mr. Williams possessing the gun, you contacted the

10:55:16  3   police department because you suspected that him

10:55:20  4   possessing this weapon, a gun on campus, may very

10:55:26  5   well violate the board policy that I recited earlier;

10:55:30  6   is that right?

10:55:30  7       A. Yes.

10:55:31  8       Q. And did you check with anyone to see if

10:55:35  9   Mr. Williams had obtained any type of permission from

10:55:39 10   the school district to have this gun on campus at any

10:55:43 11   time?

10:55:43 12       A. No.

10:55:44 13       Q. Okay. Had you -- have you learned whether

10:55:47 14   or not he ever did seek permission?

10:55:49 15       A. Permission would have been sought through

10:55:52 16   me.

10:55:53 17       Q. Okay. And so you knew that he hadn't

10:55:56 18   obtained that permission.

10:55:57 19       A. Correct.

10:55:58 20       Q. Okay. So that was one other basis why you

10:56:01 21   needed to contact the police and did contact the

10:56:04 22   police, I take it.

10:56:05 23       A. Yes.

10:56:05 24       Q. Have you had an opportunity to review the

10:56:11 25   police report that was prepared by Mr. Coleman and

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

37

11:12:43 1  needed to take.  There was a lot of conversation

11:12:47 2  about that.

11:12:50 3      Q.  And do you remember advising the officers

11:12:53 4  that he was violating school board policy by having

11:12:57 5  the gun on campus without seeking permission?

11:13:00 6      A.  That's what I recall.

11:13:02 7      Q.  Okay.  And I take it that you and Mr. Coon

11:13:09 8  wanted something -- something done.  You felt not

11:13:13 9  only was this violating a school board policy but

11:13:17 10  just from a general safety standpoint you were

11:13:20 11  concerned about this gun being on campus.

11:13:22 12          MR. PAI:  It's compound.  Vague and

11:13:23 13  ambiguous.

11:13:24 14          MS. TRUJILLO:  Join.

11:13:24 15  BY MR. MARDEROSIAN:

11:13:25 16      Q.  Is that correct?

11:13:29 17      A.  We -- we wanted the gun gone and we needed

11:13:34 18  Kent Williams to not be there till we resolved the

11:13:38 19  matter.

11:13:38 20      Q.  Right.  When you were meeting with the

11:13:47 21  police officers in Mr. Coon's office, I take it by

11:13:51 22  then it had been related to you these various

11:13:56 23  statements that Mr. Williams had made, for example,

11:13:59 24  the statement to Mr. Johnson about -- about that he

11:14:08 25  always has the gun with him and that he will get

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

48

11:27:57  1   needed to be done in order to maintain the safety of

11:27:59  2   those children; is that correct?

11:28:00  3        A.  Yes.

11:28:01  4            MS. TRUJILLO:  Vague and ambiguous.

11:28:02  5   BY MR. MARDEROSIAN:

11:28:02  6        Q.  And when you said they were looking through

11:28:04  7   the Penal Code, were they looking through a physical

11:28:07  8   book or was it online or what -- what source or

11:28:10  9   mechanism were they using to review the Penal Code?

11:28:13 10        A.  I recall a table in the office and it was

11:28:15 11   the book, the very thick blue block on the -- on a

11:28:19 12   table in the office and they were --

11:28:21 13        Q.  Page by page --

11:28:23 14        A.  Um-hmm.

11:28:24 15        Q.  -- looking through it.

11:28:25 16        A.  Correct.

11:28:26 17        Q.  And I take it that time was of the essence,

11:28:30 18   they needed to deal with Mr. Williams and this gun at

11:28:34 19   that time.

11:28:34 20        A.  Yes.

11:28:34 21        Q.  They didn't have time, in other words, to go

11:28:36 22   and consult with a lawyer, in other words, based on

11:28:38 23   what you observed.

11:28:39 24            MS. TRUJILLO:  Objection.  Calls for

11:28:40 25   speculation.  Lacks foundation.

WILLIAMS vs. CITY OF BAKERSFIELD
Geraldine Kincaid, Friday, June 10, 2016

71

1  STATE OF CALIFORNIA )
                       ) ss.
2  COUNTY OF KERN      )

3

4        I, Susan R. Wood, a Certified Shorthand

5  Reporter in the State of California, holding Certificate

6  No. 6829, do hereby certify that GERALDINE KINCAID, the

7  witness named in the foregoing deposition, was by me

8  duly sworn; that said deposition was taken Friday,

9  June 10, 2016, at the time and place set forth on the

10  first page hereof.

11        That upon the taking of the deposition, the

12  words of the witness were written down by me in

13  stenotypy and thereafter transcribed by computer under

14  my supervision; that the foregoing is a true and correct

15  transcript of the testimony given by the witness.

16        Pursuant to Federal Rule 30(e), transcript

17  review was requested.

18        I further certify that I am neither counsel for

19  nor in any way related to any party to said action, nor

20  in any way interested in the result or outcome thereof.

21        Dated this 28th day of June, 2016, at

22  Bakersfield, California.

23

24  _____

      Susan R. Wood, CSR No. 6829

25

Defendants' Exhibit 4
Susan R. Wood, CSR# 6829
06-10-16
Geraldine Kincaid

## STUDENTS

### WEAPONS AND DANGEROUS INSTRUMENTS

The Governing Board desires students to be free from the danger presented by firearms and other weapons and recognizes that they have the right to a safe and secure campus free from psychological and physical harm.

### Possession of Weapons

The Board prohibits any person other than authorized law enforcement or security personnel from possessing weapons, imitation firearms, or dangerous instruments of any kind in school buildings, on school grounds or buses, at any school-related or school-sponsored activities away from school, or while going to or coming from school.

Students possessing, exhibiting or threatening (brandishing) others with a weapon, dangerous instrument or imitation firearm are subject to suspension and/or expulsion in accordance with law, Board policy and administrative procedures.

Under the power granted to the Board to maintain order and discipline in the schools and to protect the safety of students, staff and the public, any school employee is authorized to confiscate a weapon, dangerous instrument or imitation firearm from any person on school grounds.

The principal or designee shall notify law enforcement authorities when any student possesses a weapon without permission or commits any act of assault with a firearm or other weapon. (20USC 7151; Education Code 48902; Penal Code 245, 626.9, 626.10)

Students also may be suspended if they threaten others or disrupt school activities by exhibiting a replica of a weapon.

### Reporting of Dangerous Objects

The Board encourages students to promptly report the presence of weapons, injurious objects or other suspicious activity to school authorities. The identity of a student who reports such activity shall remain confidential to the extent permitted by law.

The Superintendent or designee shall develop strategies designed to facilitate student reporting of the presence of injurious objects on school grounds, such as tip hotlines, electronic transmissions, or other methods that preserve the student's anonymity. Incident reports and records shall not identify the student who reported the possession. The strategy shall also provide a method of informing staff, students and parents/guardians that students who report the



000027

**BUSINESS AND NONINSTRUCTIONAL OPERATIONS**

DISRUPTIONS

In order to help maintain an educational environment that provides for student safety, the Governing Board is committed to keeping the schools free from disruptions and to keeping unauthorized persons from entering school grounds. The Superintendent or designee shall provide for the prompt removal from school premises of any individual who disrupts or threatens to disrupt normal school operations, threatens the health and safety of students or staff, or causes property damage in accordance with law, Board policy, or administrative procedure.

Under the right circumstances, failure to register or identify oneself may be considered to be disruptive.

District and school site safety plans shall specify action to be taken, including specific staff responsibilities, when an individual is causing a disruption. School staff shall be trained to recognize when an individual has committed acts that constitute a disruption in violation of Board policy or administrative procedure. Staff who believe that a disruption may occur shall immediately contact the principal.

**Gun Free School Zone**

Possession of unauthorized firearms, weapons, or other dangerous instruments is prohibited within 1,000 feet of school grounds without the written permission of school authorities. (Penal Code 626.9, 626.10)

Defendants' Exhibit 5
Susan R. Wood, CSR# 6829
06-10-16
Geraldine Kincaid

Legal reference: See next page



EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT/FRESNO DIVISION

_____

KENT WILLIAMS,                        )
                                      )
          Plaintiff,                  )
                                      )
      vs.                             ) No. 1:14-CV-01955-JLT
                                      )
CITY OF BAKERSFIELD, OFFICER          )
COLEMAN, OFFICER McCARTHY,            )
and DOES 1 to 100, inclusive,         )
                                      )
          Defendants.                 )
_____)

VIDEOTAPED DEPOSITION

OF

ERIC JOHNSON

Friday, June 10, 2016

Bakersfield, California

Reported by:  Susan R. Wood, CSR No. 6829

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

6

12:42:27  1  works.

12:42:28  2  BY MR. MARDEROSIAN:

12:42:29  3      Q.  Mr. Johnson, are you employed?

12:42:32  4      A.  Yes.

12:42:32  5      Q.  By whom?

12:42:35  6      A.  Panama-Buena Vista Union School District.

12:42:35  7      Q.  And what is your position, current position

12:42:37  8  there?

12:42:37  9      A.  I'm a school teacher in the opportunity

12:42:40 10  program.

12:42:42 11      Q.  What's the opportunity program?

12:42:44 12      A.  It's comprised of seventh and eighth graders

12:42:48 13  who have been removed from their home school sites

12:42:52 14  for various reasons.

12:42:58 15      Q.  Have you ever had your deposition taken

12:43:00 16  before?

12:43:01 17      A.  Never.

12:43:02 18      Q.  A deposition is a process that allows

12:43:05 19  attorneys involved in a litigated case.  In this case

12:43:09 20  it's Kent Williams versus the City of Bakersfield.

12:43:12 21  My name is Mick Marderosian; I represent the City of

12:43:15 22  Bakersfield.  This is Chantal Trujillo to my right;

12:43:18 23  she represents Mr. Williams, who is suing the City as

12:43:24 24  a result of the incident with the gun on August 28,

12:43:26 25  2014; do you understand that?

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

8

12:44:36  1      Q.  Before coming here today did you review any

12:44:38  2  documents that may be pertinent to this issue

12:44:42  3  involving Kent Williams and the gun incident on

12:44:46  4  August 28, 2014, at Tevis Junior High?

12:44:49  5      A.  No.

12:44:49  6      Q.  Okay.  It's also important that you wait for

12:44:53  7  me to state the question before you respond so that

12:44:57  8  there is an orderly process in acquiring your

12:45:00  9  testimony.  If we're both talking over each other it

12:45:04  10  makes it difficult for the reporter to accurately

12:45:07  11  report your testimony here today; okay?

12:45:09  12      A.  Okay.

12:45:10  13      Q.  All right.  You're friends with Kent

12:45:13  14  Williams or were friends with Kent Williams.

12:45:19  15      A.  More golfing buddies.

12:45:21  16      Q.  Okay.  So when was the last time that you

12:45:23  17  saw him?

12:45:23  18      A.  The day of the incident.

12:45:26  19      Q.  Okay.  There at Tevis Junior High?

12:45:28  20      A.  Yes.

12:45:29  21      Q.  Why were you there?

12:45:31  22      A.  In-service training.

12:45:32  23      Q.  Okay.  That's normally not the campus that

12:45:34  24  you're on.

12:45:35  25      A.  Correct.

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

9

12:45:37 1     Q.  Where is your campus?

12:45:39 2     A.  At the district office, office east or what

12:45:44 3 they would refer to as DOE.

12:45:48 4     Q.  Okay.  So you last saw Mr. Williams on

12:45:51 5 August 28, 2014.

12:45:53 6     A.  I'm not sure that date's correct.

12:45:59 7     Q.  Okay.  Fair enough.  What is the date that

12:46:01 8 you remember as the date of the subject incident

12:46:04 9 involving the gun?

12:46:08 10    A.  I think the 28th is the day I talked to my

12:46:11 11 administrator about it.  The incident may have been

12:46:17 12 ten -- ten days prior, two weeks prior.

12:46:22 13       MR. PAI:  I think you're -- we're getting

12:46:24 14 confused.  When he says "incident," he's talking

12:46:27 15 about when -- when Mr. Williams was arrested for

12:46:32 16 having a gun on campus.

12:46:33 17       THE WITNESS:  Oh.

12:46:34 18       MR. PAI:  He's not talking about --

12:46:36 19       THE WITNESS:  That would be the 28th.

12:46:37 20       MR. PAI:  Okay.

12:46:37 21 BY MR. MARDEROSIAN:

12:46:37 22     Q.  Okay.  What was the last date that you

12:46:40 23 remember seeing Mr. Williams?  I take it it was the

12:46:43 24 date where you had a conversation with him about the

12:46:45 25 gun.

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

10

12:46:46  1      A.   Right.   That was the day, the 14th of

12:46:49  2  August.

12:46:50  3      Q.   Okay.   So it was about ten days before the

12:46:51  4  date he was arrested?

12:46:55  5      A.   Yeah.

12:46:56  6      Q.   Is that your best estimate?

12:46:57  7      A.   Yep.

12:46:58  8      Q.   Okay.

12:46:59  9      A.   Yes.

12:46:59 10      Q.   About ten days before?

12:47:00 11      A.   (Witness nods head.)

12:47:01 12      Q.   Yes?

12:47:02 13      A.   Yes.

12:47:02 14      Q.   Okay.   So tell me about that.   How did that

12:47:04 15  come about, that conversation?

12:47:08 16      A.   The day of the gun?

12:47:10 17      Q.   Yes.

12:47:10 18      A.   Kent had been walking around the campus at

12:47:17 19  Tevis and he had stumbled into the room where we were

12:47:21 20  doing our training.   And he knows me as EJ and so he

12:47:24 21  saw me and said, "Hey, EJ, when you have a break,

12:47:27 22  come on down to my office."   And we did have a break

12:47:33 23  eventually and I didn't, but he was still milling

12:47:35 24  about the campus and saw me again and said, "Hey, I

12:47:38 25  said come on down."

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

11

12:47:39  1         So we headed to his office.  On the way

12:47:43  2  there I stopped in the principal's office.  Paul Coon

12:47:48  3  had just been hired there as the principal and I

12:47:52  4  congratulated him and welcomed him to Tevis and was

12:47:55  5  excited for him.  Kent stayed in the hallway, and

12:47:58  6  then we proceeded to his office.

12:48:01  7    Q.  Kent's office?

12:48:02  8    A.  After I was in the principal's office with

12:48:04  9  Paul, then Kent and I proceeded to his office, the

12:48:08 10  vice principal's office.

12:48:09 11    Q.  Right.

12:48:09 12    A.  He told me to close the door.  We talked a

12:48:13 13  little bit about this and that, how the training was

12:48:16 14  going.  He didn't particularly care for me saying hi

12:48:23 15  to Paul.  He claimed that Paul was going to be out to

12:48:28 16  get him, that he was one of the bad guys on the staff

12:48:30 17  that needed to be cleaned up.  This was completely

12:48:35 18  unsolicited.  He was just airing it out.

12:48:43 19       Then I can't remember the small chatter

12:48:45 20  between that, but then he said, "Hey, I want to show

12:48:48 21  you something," and in an open backpack behind his

12:48:52 22  desk he produced a firearm and he said, "This is my

12:48:58 23  gun."

12:48:59 24    Q.  Was a magazine in the -- in the stock of the

12:49:03 25  pistol?

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

12

12:49:04  1      A.  I couldn't be sure from where I was seated.

12:49:06  2      Q.  Okay.

12:49:08  3      A.  And I was shocked, a little nervous, and I

12:49:16  4  didn't have much to say, but I wanted to wrap it up.

12:49:24  5      Q.  You wanted to get out of there.

12:49:26  6      A.  I told him I think -- my break had already

12:49:28  7  started when he saw me so I knew the break was

12:49:31  8  probably already over.  So I said, "I'd better be

12:49:35  9  heading on back."  And so he said, "All right.  Well,

12:49:38  10 you know, hang in there."  And as I was opening the

12:49:40  11 door he said, "Hey, EJ, how come we never golf any

12:49:43  12 more together?"  And I didn't even get a chance to

12:49:45  13 answer before he said, "Oh, I know.  Because we have

12:49:47  14 kids now."  So I just said, "Okay, see you around,"

12:49:52  15 and that's the last I've talked to him.

12:49:56  16     Q.  That had to be unsettling to you to be in a

12:50:00  17 room where somebody pulls out a gun?

12:50:03  18     A.  Well, it still is.

12:50:06  19     Q.  Okay.

12:50:07  20     A.  It's even brought me to this point.

12:50:09  21     Q.  Yeah.  I can kind of sense there's still

12:50:12  22 some emotional response going on here.  Why is that?

12:50:17  23 Is it -- is it because of -- did you feel threatened?

12:50:23  24     A.  I was shocked.  I was aware of the district

12:50:28  25 policy knowing that that -- that's -- that's a no-no.

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

13

12:50:35 1     Q.  Did you ask him why he had that gun?

12:50:37 2     A.  Yeah.  Well, I did say that.  I said, you

12:50:40 3  know --

12:50:41 4     Q.  Why do you have that?

12:50:42 5     A.  -- why -- why -- "why do you have that gun?"

12:50:45 6  And he said something to the effect that if they're

12:50:50 7  coming to get me I'll get them first.  And I

12:50:53 8  didn't -- I don't know who "they" is, but I thought

12:51:00 9  that was an odd response.

12:51:03 10     Q.  You've given some thought about it, I take

12:51:05 11  it quite a bit, since then up to this day; right?

12:51:08 12     A.  Yes.

12:51:10 13     Q.  Probably wondering what you were going to

12:51:11 14  say here today in this deposition; right?

12:51:14 15     A.  Yes.

12:51:15 16     Q.  Do you -- thinking back on it, was it

12:51:20 17  apparent that he was paranoid?

12:51:22 18         MS. TRUJILLO:  Calls for speculation.  Lacks

12:51:23 19  foundation.

12:51:24 20  BY MR. MARDEROSIAN:

12:51:24 21     Q.  Meaning was that your state of mind, this is

12:51:27 22  a fella here that's headed over the edge here with

12:51:32 23  his paranoia?

12:51:34 24     A.  I couldn't describe his state that day.

12:51:38 25  I've golfed with him enough to think I know who he

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

15

12:53:00  1      A.  The school year hadn't even started.  I

12:53:03  2   didn't know really why he already had a beef with

12:53:07  3   him.

12:53:07  4      Q.  Yeah.

12:53:08  5          When he was speaking to you, did you detect

12:53:12  6   anything physically unusual -- slurred speech, eyes

12:53:16  7   that kept shifting or anything like that -- at all

12:53:20  8   that might have led you to the conclusion that he's

12:53:24  9   under medications or some type of drug?

12:53:27 10      A.  I couldn't conclude that at all.

12:53:29 11      Q.  Okay.  So in terms of his mental health

12:53:34 12   history, you had no knowledge of that?

12:53:36 13      A.  No.

12:53:36 14      Q.  Did you ask him if he had a permit to carry

12:53:39 15   that gun or did he say he did?

12:53:41 16      A.  He did say he had a permit.

12:53:48 17      Q.  So you left and you went back to your

12:53:50 18   training meeting; correct?

12:53:51 19      A.  Correct.

12:53:52 20      Q.  When did you report this?

12:53:54 21      A.  To my administrator 10, 12 days later.

12:54:00 22      Q.  Randy Miller?

12:54:01 23      A.  Randy Miller.

12:54:02 24      Q.  Okay.  And why did you go to Randy Miller?

12:54:05 25   What prompted that?

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

16

12:54:08 1     A. Well, for nearly two weeks I'd held on to

12:54:10 2 this information by myself and it was eating me up.

12:54:16 3 I -- the more I thought about it, the more I thought

12:54:19 4 I know it's wrong, I have to go to a superior of mine

12:54:24 5 at the very least to just get it off my chest because

12:54:26 6 if it is wrong, it needs to be handled.

12:54:29 7     Q. Yeah.

12:54:29 8     Well, I mean, did you consider that there

12:54:31 9 may be some mental issues going on here and this is a

12:54:34 10 fellow with a gun on a school campus? Was that --

12:54:38 11 was that a concern?

12:54:40 12     MS. TRUJILLO: Objection. Lacks foundation.

12:54:45 13     MR. MARDEROSIAN: No. She's making an

12:54:45 14 objection.

12:54:46 15     MR. PAI: You can answer.

12:54:47 16     MR. MARDEROSIAN: Go ahead.

12:54:47 17     THE WITNESS: No, it was just the fact that

12:54:49 18 there was a firearm in his possession and knowing

12:54:53 19 that that's not legally possible, I guess, unless

12:54:59 20 you're a police officer on the school grounds. It

12:55:03 21 just troubled me. And I did know that Randy Miller,

12:55:06 22 my boss, has a concealed permit and that he would be

12:55:09 23 of more knowledge than I was.

12:55:09 24 BY MR. MARDEROSIAN:

12:55:13 25     Q. That's why you went to him.

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

17

12:55:15   1        A.  Yes.

12:55:15   2        Q.  And what did he say to you when you reported

12:55:17   3   what you saw?

12:55:18   4        A.  Well, I didn't really report it directly.  I

12:55:21   5   just more or less asked Randy questions about a

12:55:24   6   permit, where it's permissible to have a gun, if you

12:55:28   7   have an administrative credential and a permit you

12:55:31   8   can have a gun on campus, and he kept saying

12:55:34   9   "absolutely not."  And he was becoming agitated with

12:55:36  10   my questioning to the point where I finally had to

12:55:39  11   just say, "Well, I know some information and Kent

12:55:43  12   Williams has a loaded gun on campus right now at

12:55:46  13   Tevis."

12:55:46  14        Q.  How did you know it was loaded?

12:55:48  15        A.  He told me.

12:55:49  16        Q.  Okay.  Did you know that the district had a

12:55:53  17   policy that each campus was a gun-free zone?

12:55:58  18        A.  I understood that to be across the board.

12:56:05  19        Q.  Okay.  You understood that policy, then?

12:56:07  20        A.  Yes.

12:56:08  21        Q.  That there was a policy that the board

12:56:10  22   prohibited any person to have a weapon on campus.

12:56:15  23        A.  Yes.

12:56:17  24        Q.  Had you received training from the district

12:56:19  25   in that regard?

WILLIAMS vs. CITY OF BAKERSFIELD
Eric Johnson, Friday, June 10, 2016

22

1  STATE OF CALIFORNIA )
                      ) ss.
2  COUNTY OF KERN     )

3

4       I, Susan R. Wood, a Certified Shorthand

5  Reporter in the State of California, holding Certificate

6  No. 6829, do hereby certify that ERIC JOHNSON, the

7  witness named in the foregoing deposition, was by me

8  duly sworn; that said deposition was taken Friday,

9  June 10, 2016, at the time and place set forth on the

10 first page hereof.

11      That upon the taking of the deposition, the

12 words of the witness were written down by me in

13 stenotypy and thereafter transcribed by computer under

14 my supervision; that the foregoing is a true and correct

15 transcript of the testimony given by the witness.

16      Pursuant to Federal Rule 30(e), transcript

17 review was requested.

18      I further certify that I am neither counsel for

19 nor in any way related to any party to said action, nor

20 in any way interested in the result or outcome thereof.

21      Dated this 28th day of June, 2016, at

22 Bakersfield, California.

23

24 _____

   Susan R. Wood, CSR No. 6829

25

EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT / FRESNO DIVISION

_____

KENT WILLIAMS,                    No. 1:14-CV-01955-JLT

                    Plaintiff,

vs.

CITY OF BAKERSFIELD, OFFICER
COLEMAN, OFFICER McCARTHY,
and DOES 1 to 100, inclusive,

                    Defendants.
_____


DEPOSITION OF SERGEANT ROYCE HAISLIP

Taken at

Keleher's Certified Shorthand Reporters
19237 Flightpath Way, Suite 100
Bakersfield, California

Thursday, September 1, 2016 at 3:29 P.M.


Reported by:

Ashleigh Button, CSR #14013

SERGEANT ROYCE HAISLIP,
                Having been sworn, testified as follows:

                EXAMINATION BY MR. MARDEROSIAN:

     Q.    Can you give us your name, please?

     A.    It's Royce, R-O-Y-C-E, and the last is

Haislip, H-A-I-S-L-I-P, as in Paul.

     Q.    All right.  Well, thank you for coming here

today.

           Do I understand that you are a sergeant with

the Kern County Sheriff's Department?

     A.    Yes, sir.

     Q.    And how long have you been with the Kern

County Sheriff?

     A.    Almost 20 years.

     Q.    Congratulations.  And in October of 2015,

during the time period that you were dealing with this

issue regarding a permit, a gun permit, concealed

weapons permit, issued to Kent Williams, what were your

duties at that time?

           How would you describe your job duties at that

time?

     A.    I was assigned to the Kern County Sheriff's

licensing unit, which handles concealed weapon permits,

explosive permits, business licenses, things of that

nature.

Q.   I see.  Were you involved in any aspect of the issuance of the license to Kent Williams in 2013?

A.   No, sir.

Q.   I see.  In terms of the application process, were you involved in that at all?

A.   Not in the application, no, sir.

Q.   All right.  When did you come into the picture involving this issue over the concealed weapons permit that had been issued to Kurt Williams -- Kent Williams?

A.   When I was assigned to the unit in December of '14, that application -- or I'm sorry, that permit was under suspension pending a review.

     And I came across that information, and it appeared that that review had kind of stalled out. There wasn't any resolution to it, so I began looking into that to see what we needed to do to resolve that suspension.

Q.   Okay.  And when you say looked into that, what did you do that led to the revocation of the license or the permit?

A.   I reviewed the -- there was a memo written that contained some information about what Sergeant Anton and at that time Sergeant Smallwood had done regarding an interview with Mr. Williams; then I spoke to Sergeant Smallwood about that as well and then

1  <u>reviewed the initial application that Mr. Williams had</u>

2  <u>submitted when he first applied for a CCW.</u>

3      Q.   Okay.  And let's do this:  Before you -- right

4  there to your left, there are some records there.  And

5  in the lower right-hand corner, I want to -- there's a

6  Bates stamp number, and I'll refer to various pages as

7  we go along in this.  In the lower right-hand corner of

8  every page, there's a number there, Sergeant Haislip.

9          But before we go on, let me introduce myself.

10  I'm Mick Marderosian.  I'm an attorney for the

11  Bakersfield -- City of Bakersfield Police Department.

12  We've been sued by Mr. Williams.  His attorney is

13  sitting to your right, Joel Andreesen.

14          I'm going to ask you some questions for the

15  purpose of creating a record of your testimony to

16  discover information that you know that led to the

17  revocation of this permit.  And it's similar to giving

18  testimony in a court of law.  There's no judge or jury

19  present, obviously, but the questions and answers

20  process is the same.

21          There may be objections to some of the

22  questions that will occur, and a judge will decide on

23  those objections at a later time.  That's how the

24  process works in terms of a deposition in a civil case.

25          Do you understand that?

1    A.    Yes.

2    Q.    Have you ever given a deposition before?

3    A.    Yes, sir.

4    Q.    All right.  So you're familiar with the

5    process?

6    A.    Yes, sir.

7    Q.    All right.  Now, let's do this:  The records

8    that are before you that have been marked as Exhibit A

9    to the deposition of James Anton, Sergeant Anton, and

10   we'll make them as Exhibit A to your deposition as

11   well.

12        (Exhibit A was marked for identification.)

13   BY MR. MARDEROSIAN:

14   Q.    If you go to Bates stamp page 28, I think

15   that's the portion of the application that was called

16   into question.

17        And specifically at the bottom, questions two

18   and three; is that correct?

19   A.    My issue was with question two, yes.

20   Q.    All right.  So it was more focused on question

21   two than question three?

22   A.    For the purposes of what I reviewed, yes.

23   Q.    All right.  Well, explain that.  What do you

24   mean?

25        What did you review and what was the

significance of question number two that led to the revocation?

A.    Question number two reads:

"Have you ever been in a mental institution, treated for mental illness, or been found not guilty by reason of insanity?  If yes, please explain."

Mr. Williams checked the "no" box on his application, and during the course of the investigation, when his concealed weapons permit was suspended, information was obtained that at the time of his application, he was being treated for, I believe it was anxiety.  Anxiety is defined as a mental illness, and he was being treated for that.

So my concern was the fact that Mr. Williams either knew or should have known that his anxiety disorder that he was being treated for should have been listed on the application.

Q.    And you felt that he wasn't being forthright in regard to the response that he gave?

A.    I can't say that he lied.  I can just say that like I -- like I explained and it was also in my recommendation was that he either knew or should have known that that was the case.

Q.    Okay.  And should have reported that information in this application?

1      A.    That's correct.

2      Q.    I see.  And was that the issue that you

3 focused on as a licensing agent for the county in

4 regard to the revocation of this permit?

5      A.    Yes, sir.

6      Q.    Okay.  In terms of the use of the marijuana

7 and some of the called-in information or reported

8 information from some of the people that related

9 comments that Mr. Williams had made, were any of those

10 two areas significant to you in regard to the

11 revocation or not?

12      A.    I'm -- I'm not sure exactly what you're

13 referring to as far as the comments that were made.  I

14 would have to review that information to refresh my

15 memory.

16      Q.    Okay.  Let's go to page Bates stamp 33.  I

17 think it's a report that you wrote to Lieutenant Jauch,

18 J-A-U-C-H, on October 2, 2015, correct?

19      A.    Yes, sir.

20      Q.    Have you reviewed this before coming here

21 today, Sergeant Haislip?

22      A.    Very briefly.  I did not look through the

23 entire application, though.

24      Q.    All right.  Well, let's kind of go through

25 this.  In this report, you indicate that Mr. Williams

is a school administrator, and he was arrested by the
Bakersfield PD for taking his CCW to his school.

The permit was suspended while an
investigation was completed, and the permit was
reviewed by the Sheriff's Office.  On September 23 --
I'm paraphrasing here -- 2014, you relate that
Lieutenant Smallwood and Sergeant Anton met with
Mr. Williams and his attorney, and during the course of
that discussion, Mr. Williams admitted that he had been
treated for anxiety and had been prescribed medication,
Paxil, to treat the condition.  And he also admitted to
using what he refers to as medical marijuana for four
or five years to treat migraine headaches; is that
correct that you -- that's what you gleaned from the
report?

A.    Yes, sir.

Q.    Then you indicate that section seven, question
two, on the application recites the question that you
just related in regard to being treated for mental
illness, and you point out that Williams did not
include his anxiety or his treatment for anxiety on his
application, because he did not think it was a mental
illness.

You checked with the National Institute of
Mental Health website, and they classify anxiety

disorders as a mental disorder; is that correct?

A.    Yes, sir.

Q.    And you then indicate on Bates stamp 34 that you believe Mr. Williams either knew or should have known that the condition for which he was being treated; specifically, the anxiety disorder, was, in fact, a mental disorder, which he failed to list on his application, and therefore, you recommended revocation of this permit; is that correct?

A.    Yes, sir, that's correct.  The only thing I didn't -- and I have reviewed that memo; however, I just didn't recall the specific statements that you had referenced in regards to things that he might have said that would have been pertinent in my investigation.

Q.    I see.  But you know -- if you go to Bates stamp 36, in the second paragraph there, you see that information that is there reported by Sergeant Anton, Bates stamp 36, second paragraph?

A.    Yes, I see that.  That appears -- the second paragraph appears to have a statement from --

Q.    I guess, an anonymous caller?

A.    Correct.  That's not attributed to Mr. Williams.

Q.    Okay.

A.    And if Mr. -- the only things referenced here

```
 1   to my boss, who is Lieutenant Jauch, that's the
 2   J-A-U-C-H, so that it could be forwarded through the
 3   chain of command.
 4          Given the high profile nature of this
 5   incident, I wanted to make sure that somebody within
 6   the Sheriff's Office had a chance to review at least
 7   the recommendations that I made.
 8      Q.   And did they agree with your recommendation?
 9      A.   Yes, sir.
10      Q.   Okay.  So if we go to Bates stamp page 14, I
11   think this is the letter that you signed and also sent
12   to Mr. Williams revoking the permit; is that correct?
13      A.   Yes, sir.
14      Q.   And did you ever speak with Mr. Williams
15   directly?
16      A.   I have spoken to him on the phone.  I don't
17   recall the specific nature of that other than to tell
18   him I think I was reviewing the information as it
19   pertained to the CCW permit.
20      Q.   Okay.  So is it accurate to say that as part
21   of your investigation, before you recommended
22   revocation, you did speak with Mr. Williams yourself?
23      A.   Yes.  I did speak with Mr. Williams on the
24   phone.
25      Q.   Okay.  All right.  Now -- and you stand by the
```

REPORTER'S CERTIFICATION

I, Ashleigh Button, a Certified Shorthand Reporter in and for the State of California, holding Certificate No. 14013, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewritten form under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am neither counsel for, nor in any way related to any party to said action, nor in any way interested in the result or outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name on _____, 2016.


_____

Ashleigh Button, CSR #14013

EXHIBIT E

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT / FRESNO DIVISION

3    _____

4

5  KENT WILLIAMS,                    No. 1:14-CV-01955-JLT

6                    Plaintiff,

7  vs.

8  CITY OF BAKERSFIELD, OFFICER
   COLEMAN, OFFICER McCARTHY,
9  and DOES 1 to 100, inclusive,

10                   Defendants.
   _____

11

12

13            DEPOSITION OF SERGEANT JAMES ANTON

14                    Taken at

15       Keleher's Certified Shorthand Reporters
          19237 Flightpath Way, Suite 100
16             Bakersfield, California

17       Thursday, September 1, 2016 at 2:51 P.M.

18

19                   Reported by:

20            Ashleigh Button, CSR #14013

21

22

23

24

25

1

possessing a concealed weapons permit."

Is that what Mr. Williams said?

A.    I believe so.

Q.    Okay.  And as to question three, Williams --
Mr. Williams basically said that he felt he answered
that question correctly, as well; is that right?

A.    Yes.

Q.    So going to Bates stamp page 38, you write
that that Sergeant Smallwood and yourself told
Mr. Williams that the permit would be reviewed for
suitability and that you would get back to him
regarding the outcome of the review; is that right?

A.    Yes.

Q.    So your task was to investigate the issuance
of the permit as to whether or not it was a valid
issuance based on the information that was provided by
Mr. Williams?

Was that the focus of your investigation?

A.    Yes.

Q.    So was there anything else that you did other
than meet with Mr. Williams, review the application as
to what information Mr. Williams had provided to get
the permit?

Was there anything else that you did beyond
that?

A.   It says here --

        Q.   Did you do any research, talk to anyone else,
consult with anyone, anything like that?

        A.   It says here that I spoke to Sergeant Heredia
from the Bakersfield Police Department.

        Q.   Okay.  And what did Sergeant Heredia tell you
that was pertinent to your ultimate suspension of the
permit?

        A.   I don't believe anything was -- that he told
me was -- had to do with the ultimate suspension of the
permit.

        Q.   Okay.  Fair enough.

             And then it says on September 26th, which is a
couple of days later -- no, same day?

             So on the same day, you called Mr. Williams
and notified him that the permit was being suspended --

             MR. ANDREESEN:  Objection.

BY MR. MARDEROSIAN:

        Q.   -- and he said that -- he said he understood
and said that the BP still had the permit and all of
his guns, correct?

             MR. ANDREESEN:  Objection.  I think it
misstates the evidence -- testimony.

             Go ahead.

             I think, Mick, he interviewed him on September

                                                          16

23rd.

MR. MARDEROSIAN:  Oh, is that -- okay.  Oh,
yeah, September 23, you're right.  The report is dated
September 26.  Okay.

BY MR. MARDEROSIAN:

Q.    So -- okay.  Because you wrote the report
after you spoke with Mr. Williams, then?

A.    Correct.

Q.    All right.  And so who came to the conclusion
that the permit needed to be suspended?

A.    I told -- talked to Sergeant Smallwood, and we
both decided that it needed to be suspended.  And the
ultimate decision for CCW lies with the sheriff, so --

Q.    All right.  And in terms of the ultimate
decision to revoke, that was Sheriff Youngblood's
decision to revoke the permit?

A.    I don't -- I turned it over to, I believe,
whoever the sergeant of licensing was, and they
continued on with the investigation, and later did
the -- revoked it.  I --

Q.    Okay.

A.    I don't know who, if it was Sheriff Youngblood
or if it was someone through the chain of command.

Q.    I see.  So if we go to Bates stamp 14, there's
a letter to Mr. Williams advising him that the permit

is being revoked, and it says "Sincerely, Donny
Youngblood, Sheriff, Kern County," but it looks like
it's signed by Royce Haislip, H-A-I-S-L-I-P, Sheriff,
General Investigations Division.

 Is that consistent with your understanding of
how the revocation occurred?

 A.  Correct.

 Q.  Who is responsible for that, making that
decision?

 A.  I -- you got me a little bit confused right
there.  Sergeant Haislip wrote the -- the revocation
letter per this paper.

 Q.  All right.  Okay.  And did you talk with
Sergeant Haislip at all?

 A.  I don't recall.

 Q.  Okay.  And what was the basis why you and
Sergeant Smallwood decided to suspend the license?

 A.  The use of the marijuana and the use of Paxil.

 Q.  All right.  And did it have anything to do
with the answers in regard to questions two and three
on page nine of the application for the permit that we
discussed earlier at Bates stamp 28?

 A.  I don't know how you mean, does it have to do
with the answers.  The answers were inconsistent with
the later discovery.

Q.   All right.   So that's what you concluded --
you and Sergeant Smallwood concluded that the answers
provided by Mr. Williams at the time of his application
were inconsistent with the information that you later
acquired from Mr. Williams?
         A.   Right.
         Q.   Okay.   And that then was the basis why you
recommended suspension of his permit on September 26,
2014?
         A.   Yes.
         Q.   And then in terms of the ultimate decision to
revoke the license, you played no role in discussing it
with Sheriff Youngblood or with Sergeant Haislip in
that regard?
         A.   I never had a conversation, but they did have
a copy of my memo.
         Q.   Okay.  I see.  All right.
              Okay.  And is that the extent of your
involvement in regard to this issue concerning the gun
permit issued to Kent Williams?
         A.   I believe so.
         Q.   Do you know Mr. Williams?
         A.   Just through the meeting that I had with him,
and I talked to him on the phone a couple of times.
         Q.   Okay.  Okay.  I think that's all I have.

1     A.    No, he never said anything like that.

2     Q.    And if I understand correctly, you provided

3  the information to -- is it Sergeant Haislip?

4     A.    It's Sergeant Haislip.  I provided the

5  information up my chain of command, and where it goes

6  from there --

7     Q.    You don't know what happened to it after that?

8     A.    Right.

9     Q.    All right.

10          MR. ANDREESEN:  I don't have any further

11  questions.

12          MR. MARDEROSIAN:  Just a couple of questions

13  to wrap this thing up.

14          FURTHER EXAMINATION BY MR. MARDEROSIAN

15     Q.    I take it that you concluded, based on your

16  discussions with Mr. Williams on September 23, 2014,

17  that he had not been forthright in the responses that

18  he gave to questions two and three on the application;

19  am I correct?

20     A.    Yeah.

21     Q.    You concluded he had not been truthful in

22  giving those responses to item Nos. 2 and 3 on the

23  application; is that correct?

24     A.    I concluded that they were at least

25  inconsistent with what the responses were that he gave

to us, yeah.

Q.   And so as to whether or not he was being truthful in terms of his use of Paxil or his use of marijuana and the reasons for it and the frequency of use, do you know if he was being honest with you when you spoke with him on the 23rd of September?

A.   No, I can't know that.

Q.   And there was more than just the issue with the application.  There was concern from the anonymous caller, as well.

I mean, you had to consider that as well, did -- didn't you?

A.   That's --

Q.   Whether or not it came secondhand or not, there was some concern of his health in terms of whether or not this man should be carrying a gun at all; is that correct?

A.   That's what provoked the investigation.

Q.   Right.  And so in terms of a concealed weapons permit, do you have any experience in knowing whether or not that means that you're supposed to -- you're only permitted to carry the weapon on your person or in someplace where it's locked out and can't be accessed?

Is that your understanding or do you know?

REPORTER'S CERTIFICATION

I, Ashleigh Button, a Certified Shorthand Reporter in and for the State of California, holding Certificate No. 14013, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewritten form under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am neither counsel for, nor in any way related to any party to said action, nor in any way interested in the result or outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name on _____, 2016.


_____

Ashleigh Button, CSR #14013

EXHIBIT F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT/FRESNO DIVISION

_____

KENT WILLIAMS,                        )
                                      )
          Plaintiff,                  )
                                      )
      vs.                             ) No. 1:14-CV-01955-JLT
                                      )
CITY OF BAKERSFIELD, OFFICER          )
COLEMAN, OFFICER McCARTHY,            )
and DOES 1 to 100, inclusive,         )
                                      )
          Defendants.                 )
_____)


VIDEOTAPED DEPOSITION

OF

PAUL ANDREW COON

Friday, June 10, 2016

Bakersfield, California


Reported by:  Susan R. Wood, CSR No. 6829

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

8

| | | |
|---|---|---|
| 12:08:08 | 1 | My sons went to the school for four years |
| 12:08:11 | 2 | prior. |
| 12:08:11 | 3 | BY MR. MARDEROSIAN: |
| 12:08:12 | 4 | Q. Oh, to Tevis. |
| 12:08:13 | 5 | A. To Tevis. And I was a vice principal, so we |
| 12:08:16 | 6 | were peers. |
| 12:08:17 | 7 | Q. Okay. You weren't a vice principal at |
| 12:08:19 | 8 | Tevis, though. |
| 12:08:20 | 9 | A. Hmm-umm. |
| 12:08:21 | 10 | Q. You were a vice principal -- |
| 12:08:22 | 11 | A. No. |
| 12:08:22 | 12 | Q. -- at? |
| 12:08:26 | 13 | A. Warren Junior High. |
| 12:08:26 | 14 | Q. Warren Junior High. Okay. |
| 12:08:29 | 15 | And prior to -- well, let me ask you this. |
| 12:08:35 | 16 | On August 14, 2014 -- excuse me, August 28, 2014, the |
| 12:08:42 | 17 | date of the incident with the gun, the police |
| 12:08:46 | 18 | prepared a report and the report indicates that -- |
| 12:08:52 | 19 | and I'll just read into the record what the police |
| 12:08:56 | 20 | reported, and I want to find out from you whether or |
| 12:08:58 | 21 | not it's accurate. It states on Page 6, "I made |
| 12:09:04 | 22 | contact with Kincaid, who arrived at the school. She |
| 12:09:10 | 23 | stated the district never gave Williams permission to |
| 12:09:12 | 24 | carry a firearm on school grounds and he never |
| 12:09:16 | 25 | requested to. I made contact with the principal |

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

9

12:09:20 1 identified as Paul Coon. He stated he was concerned

12:09:24 2 for Williams' safety because, quote, last Wednesday,

12:09:29 3 end of quote, Williams told him he was on suicide

12:09:33 4 watch after having a rough day. Coon stated Williams

12:09:36 5 told him that he was starting counseling again for

12:09:39 6 depression because he is, quote, messed up in the

12:09:43 7 head, end of quote."

12:09:45 8 Is that an accurate statement?

12:09:52 9 A. Yes.

12:09:53 10 Q. Is that what you told the police -- the

12:09:54 11 police officers? And in this case it was Detective

12:09:57 12 Coleman.

12:09:57 13 A. Yes.

12:09:58 14 Q. And let's go back to the Wednesday before

12:10:02 15 the date of the incident. Tell us about that, your

12:10:06 16 interaction with Mr. Williams and what prompted this

12:10:11 17 topic.

12:10:11 18 A. In the morning students arrive, we would

12:10:15 19 stand in a grassy area where the kids congregate and

12:10:20 20 just talk to kids as they enter and talk to each

12:10:24 21 other and just kind of hang out. It's a 30-minute

12:10:27 22 time period of supervision where the students are

12:10:30 23 supervised before classes start and we're responsible

12:10:31 24 for the supervision. I just said, "How are you

12:10:34 25 today?" And he responded, "Not well." And "What's

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

10

12:10:39  1  wrong, what's up?"  And he said he had a bad night.

12:10:46  2  And I said, "Oh, I'm sorry, what happened?"  And he

12:10:48  3  said, "I was on suicide watch last night, I'm really

12:10:53  4  messed up in the head."  And he put his fingers to

12:10:57  5  his temple and just (makes noise) did that, which --

12:11:01  6      Q.  Like a gun?

12:11:02  7      A.  Like a gun.  He would do (makes noise).

12:11:05  8      Q.  And what did you say to him?

12:11:07  9      A.  I explained, "Gosh, I hope everything's

12:11:11  10  okay, no worries here, you know, I'm here if you need

12:11:15  11  me.  If you need anything let me know."

12:11:18  12      Q.  So the "no worries here" was a statement you

12:11:20  13  made.

12:11:20  14      A.  Yes.

12:11:22  15      Q.  Did he tell you that he was beginning

12:11:23  16  counseling?

12:11:24  17      A.  He did.

12:11:25  18      Q.  And did you ask him what type of counseling?

12:11:27  19      A.  No.

12:11:30  20      Q.  And at that time, at that moment, was

12:11:32  21  anything else said or did the conversation end?

12:11:37  22      A.  I don't recall exactly.  We stood there the

12:11:41  23  entire time --

12:11:42  24      Q.  Okay.

12:11:43  25      A.  -- supervising kids.

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

11

12:11:44 1      Q.  Okay.  Could you tell physically that there

12:11:46 2  was something going on with him?

12:11:50 3      A.  At that moment, no.

12:11:52 4      Q.  Okay.  But his words were concerning to you?

12:11:55 5      A.  Correct.

12:11:59 6      Q.  Now, in his deposition Mr. Williams -- I

12:12:06 7  took Mr. Williams' deposition.  He said he was just

12:12:10 8  joking with you.  Was there anything that he did or

12:12:13 9  said that your state of mind at that time indicated

12:12:21 10 that he was just joking with you?

12:12:23 11     A.  No.

12:12:25 12     Q.  It was -- it was serious.

12:12:26 13     A.  Serious.

12:12:27 14     Q.  Okay.  Now, you said this was last Wednesday

12:12:37 15 so that -- that means this is the Wednesday before

12:12:42 16 August 28, 2014; correct?

12:12:44 17     A.  Correct.

12:12:44 18     Q.  How many days are we talking about there?

12:12:48 19     A.  From the time of the incident and when that

12:12:51 20 happened?

12:12:52 21     Q.  Yeah.  When the conversation was to the

12:12:54 22 time --

12:12:54 23     A.  It was one week.

12:12:54 24     Q.  Okay.

12:12:55 25     A.  Wednesday to Wednesday we had -- it was the

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

20

12:21:26 1      Q.  So school is now in session, then.

12:21:27 2      A.  Right.  And I got a phone call stating --

12:21:29 3  asking if -- from Gerrie Kincaid if Kent was there,

12:21:33 4  and I said "yes," and she said -- I don't recall the

12:21:37 5  exact words except that we're on our way to the

12:21:41 6  school and the Bakersfield Police Department are on

12:21:43 7  their way as well and we have a belief that he may

12:21:47 8  be -- I don't even know if they told me that he might

12:21:50 9  have a gun on him or not.  I just knew that they were

12:21:53 10  on their way --

12:21:57 11      Q.  Okay.

12:21:59 12      A.  -- and asked if he was there.

12:22:00 13      Q.  You don't remember if they told you he has a

12:22:04 14  gun?

12:22:04 15      A.  Because it was minutes later that they

12:22:08 16  arrived, so I'm not sure if they told me when they

12:22:08 17  came or if they told me when they called and said

12:22:09 18  they were on their way.

12:22:10 19      Q.  When you learned that he had a gun, that

12:22:13 20  must have freaked you out somewhat.

12:22:16 21      A.  I was shocked.

12:22:17 22      Q.  Were you concerned?

12:22:17 23      A.  I was very concerned.

12:22:18 24      Q.  For students and others?

12:22:21 25      A.  I was concerned for -- for him.  For him

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

21

12:22:32 1 more than anything.

12:22:33 2     Q. Did he ever tell you that he was bringing a

12:22:35 3 gun to campus or had brought a gun to campus?

12:22:38 4     A. No.

12:22:42 5     Q. So you were there when the police and

12:22:44 6 Ms. Kincaid arrived?

12:22:45 7     A. Yes.

12:22:46 8     Q. And what occurred?

12:22:48 9     A. They asked where he was, or we might have

12:22:52 10 called him to the office -- he might not have been in

12:22:55 11 the office -- via radio and the police officers and

12:22:58 12 Kent and Gerrie went into his office and I was in my

12:23:02 13 office. They had words in his office that I wasn't

12:23:08 14 there for, but I was in my office and so my office

12:23:12 15 became the spot they would -- they left Kent in his

12:23:16 16 office and when they -- the police officer had to

12:23:19 17 come out and do something or call a superior, they

12:23:22 18 would come to my office or go back and forth. It was

12:23:24 19 just kind of -- and we were running the school still

12:23:26 20 so I was still doing school stuff.

12:23:29 21     Q. Were you ever in Mr. -- in the presence of

12:23:30 22 Mr. Williams when he made comments to the police or

12:23:35 23 to Ms. Kincaid or to anybody about the gun?

12:23:38 24     A. Not at the beginning, but at the -- they

12:23:40 25 moved him from his office to my office and he sat in

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

28

12:30:14  1          Yes.

12:30:14  2          Q.  And what did you write down in regards to

12:30:17  3  that incident, that conversation?

12:30:18  4          A.  I don't recall exactly.

12:30:20  5          Q.  Did you share that with any -- that --

12:30:20  6  strike that.

12:30:22  7          Did you share that document with anyone with

12:30:24  8  the school district before August 28th, 2014?

12:30:27  9          A.  No.

12:30:28  10         Q.  Did you ever show that document to law

12:30:34  11  enforcement before August 28th, 2014?

12:30:37  12         A.  No.

12:30:44  13         Q.  And would that be true also for the other

12:30:47  14  document that you referred to, the conversation that

12:30:48  15  took place on the Wednesday before the August 28th,

12:30:51  16  2014?

12:30:52  17         A.  Yes.

12:30:53  18         Q.  Sir, when you spoke to law enforcement that

12:31:02  19  was present at the Tevis Junior High campus on

12:31:05  20  August 28th, 2014, did you make the gesture of the

12:31:11  21  gun to the head to the officer when you talked to

12:31:15  22  him?

12:31:15  23         A.  I did.

12:31:31  24         Q.  Before the school year started for the

12:31:37  25  2014-2015 school year, did you attend any trainings

WILLIAMS vs. CITY OF BAKERSFIELD
Paul Andrew Coon, Friday, June 10, 2016

34

1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF KERN      )

3

4           I, Susan R. Wood, a Certified Shorthand

5   Reporter in the State of California, holding Certificate

6   No. 6829, do hereby certify that PAUL ANDREW COON, the

7   witness named in the foregoing deposition, was by me

8   duly sworn; that said deposition was taken Friday,

9   June 10, 2016, at the time and place set forth on the

10  first page hereof.

11          That upon the taking of the deposition, the

12  words of the witness were written down by me in

13  stenotypy and thereafter transcribed by computer under

14  my supervision; that the foregoing is a true and correct

15  transcript of the testimony given by the witness.

16          Pursuant to Federal Rule 30(e), transcript

17  review ws requested.

18          I further certify that I am neither counsel for

19  nor in any way related to any party to said action, nor

20  in any way interested in the result or outcome thereof.

21          Dated this 28th day of June, 2016, at

22  Bakersfield, California.

23

24          _____
                Susan R. Wood, CSR No. 6829
25

EXHIBIT G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT/FRESNO DIVISION

---o0o---

KENT WILLIAMS,                        )
                                      )   Case No.
                                      )   1:14-CV-01955-JLT
                    Plaintiff,        )
                                      )
        vs.                           )
                                      )
CITY OF BAKERSFIELD,                  )
OFFICER COLEMAN, OFFICER              )
McCARTHY and DOES 1 TO 100,           )
inclusive,                            )
                                      )
                                      )
                    Defendants.       )
                                      )
                                      )


VIDEOTAPED DEPOSITION OF:


                    VERION COLEMAN
             FRIDAY, AUGUST 5, 2016
                  12:31 p.m.




Reported By:  Dawn Thompson, CSR No. 7517

```
 1        A.  Yeah, they were really short.  I would go
 2   into a school, I'd usually touch base with the
 3   principal or the vice principal at any school I would
 4   go to --
 5             THE REPORTER:  Slow down.  Slow down.              12:43
 6             THE WITNESS:  Oh, I'm sorry.  -- "Good
 7   afternoon.  Are there any problems?  You guys have any
 8   events coming up that you would like for our SRO
 9   officers to come out and participate in?"
10             I mean, I've seen a football in a principal's    12:44
11   office and talk about the football for a second or --
12   it could be anything.
13             And I do remember in one of my conversations
14   with him, I had talked about the Famoso Raceway.
15   That's the only thing that stands out.                     12:44
16   /////
17   BY MR. ANDREESEN:
18        Q.  Now, on August 28, 2014, did you receive a
19   call from someone at Tevis indicating that there was an
20   issue involving Mr. Williams?                              12:44
21        A.  No.  And, again, I can kind of give you more
22   of a narrative type thing to let you know how that
23   goes.
24        Q.  If your attorney will allow that, that's
25   fine.                                                       12:44
              SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904
```

```
 1          MR. MARDEROSIAN:  Go right ahead.

 2          THE WITNESS:  So the way -- the way it works

 3   is, again, I had the phone -- I'll try to talk slow

 4   too, ma'am.  I'm sorry.

 5          I have the phone to where all the schools had          12:44

 6   my number.  And Gerrie Kincaid was one of the staff

 7   members that had my number.  And she called me and said

 8   that she received a call from Randy Miller that Kent

 9   Williams may possibly be in possession of a firearm.

10   And I said, "Well, okay.  Well, what makes you guys          12:45

11   think that?"  And she said that -- the way I understood

12   it is that all of the staff at the schools maybe in the

13   Panama-Buena Vista School District had some kind of a

14   in-service training that they normally attend before

15   the beginning of the year.  It could be on active          12:45

16   shooting.  It could be on various things.

17          Well, during a break in one of those

18   trainings, Kent Williams had told an unidentified staff

19   member or actually showed them -- unzipped a backpack

20   and showed that staff member a loaded firearm and said,          12:45

21   "I will get them before they get me."

22          She didn't have any idea what he meant by

23   that.  So I said, "Okay."  I said, "Well, I need to

24   notify Sergeant Grubbs immediately.  This is a very,

25   very important assumption -- this is a very important          12:45
```

1  thing." So she said, "Well, don't go to the school
 2  until we go." I said, "Well, no. That ain't how we
 3  work. This is a very important thing. You know, let
 4  me do what we do." And she said, "Okay. We will be on
 5  the way to the school."                                    12:46
 6          I immediately hung up with her, called
 7  Sergeant Grubbs and explained to him my conversation
 8  with Ms. Kincaid. He said, "Well, you guys need to get
 9  to the school immediately, see if he has a gun." And
10  that's the first time I -- that I remember asking        12:46
11  Sergeant Grubbs, well -- I'll just continue with what I
12  remember.
13          Q.  Sure.
14          A.  So I remember calling Ser -- Officer
15  McCarthy, who was working overtime that day. And he      12:46
16  was -- I asked him where he was at, and he told me I
17  think he was at Ollivier Middle or Ollivier School. I
18  can't remember the name of the school. And I wasn't
19  far from it so I met him at the school.
20          I went into the office. I said, "Hey, what       12:46
21  do you got going?" I believe he was getting ready to
22  work on a lockdown drill or something with the school.
23  I said, "Well, we need to cancel that. Let's go
24  outside. We need to talk." Me and him go outside and
25  I explain to him what Ms. Kincaid said. And I said,      12:46
                SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

1  "We need to get over to the school."  I said, Let's --
2  just follow me and we will stop a couple blocks before
3  we get to the school."
4         So we drove.  I remember seeing Tevis and we
5  pull into a neighborhood where there was a cul-de-sac.     12:47
6  Me and him parked next to each other.  And I -- I
7  believe it was me that called our records division and
8  ran Kent Williams to see if he had firearms registered
9  to him.  I wanted to see if he had weapons, you know,
10 how many weapons he had registered to him, if he had a    12:47
11 valid CCW.  And they said yes, he has seven guns
12 registered to him.  They gave us a list of the guns, I
13 believe.  And then they told me that he had a valid CCW
14 permit.
15        So I told McCarthy "Well, let's just go in         12:47
16 there.  And I think the first thing we need to do is
17 let Bill Darbee, who is a retired sergeant with
18 Bakersfield police and who is in charge of their
19 security, we need to let him know just in case
20 something goes bad.  I think it's important to let him    12:47
21 know."  So we proceed to the school.
22        When we get there, I ask the lady at the
23 front, I say, "Hey, is Mr. Darbee here?"  She said,
24 Yeah.  Let me call him."  I said, "Okay."  So there is
25 a little nurses' station.  You walk into the office,      12:48

SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

1  the nurses' station is to the right.  I'm standing
2  there with McCarthy and I said, "Well, I have to use
3  the restroom."  And the bathroom is literally right
4  here.  So I step into the restroom, and I'm in there
5  for maybe five minutes.  And when I step out, McCarthy          12:48
6  is gone.  So I just step out and then I asked the front
7  staff, I said, "Where is my partner?"  She said, "Kent
8  Williams came and got him."  Okay.
9             So I proceed -- I believe as I'm proceeding
10 down the hall, Bill Darbee kind of met me half way and          12:48
11 I said went, "Hey, we are doing an investigation --
12             THE REPORTER:  Slow down.
13             THE WITNESS:  I'm sorry.  "We are doing an
14 investigation into Kent Williams possibly having a
15 firearm."  And he said, "Are you guys good?"  And I             12:48
16 said, "Yeah, I believe we are good."  He said, "Okay."
17 And he went back out to wherever his office is.
18             So Kent Williams' door was shut.  I knocked
19 on it.  He said, "Come in."  I came in.  He said, "Hey,
20 Coleman, how are you doing," something along those              12:48
21 lines.  Don't quote me on that.  He made a comment
22 about like "Which one of my little knuckle heads are
23 you here to see today," or something like that in a
24 playful manner.
25             I went in, I shut the door.  I said, "Well,         12:49

SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

sir, we are here for you." And he said, "Well, what's
going on? And I said, "We got a call that you may have
a gun." And as he is sitting in his chair kind of like
I am, the door is to -- by his right hand. I guess I'm
trying to describe it because it's on audio. McCarthy          12:49
is to his left. And, you know, his desk is a normal
size desk.

       To his left is a backpack maybe two feet.
It's close enough for him to lean over and reach into
the backpack. I said, "So I'm here -- I mean, do you          12:49
have a firearm?" And he said, "Yeah, I do right here."
And I don't remember if it was his right or his left
hand, but he started to lean over and reach into an
unzipped backpack. And I said, "Hold on for a second,
please." I said, "Do you mind if McCarthy gets it?"          12:49
And he said, "No, no. Sure. Go ahead."

       So McCarthy reaches down, picks the backpack
up, kind of moves back a little bit and he sets it on
the table that's in the office. McCarthy takes out a
Glock handgun. I see him take the magazine out and he          12:50
clears it and then I believe -- again, this is all --
I'm going off memory. Kent Williams says something.
"I didn't know. I didn't know I wasn't supposed to
have it. All the research I've done, I thought I
could. Am I going to jail? Am I under arrest?"          12:50

```
 1          MR. MARDEROSIAN:  Slow down just a little
 2   bit.
 3          THE WITNESS:  Okay.  I said, "You are not
 4   under arrest right now," I said, "but you are being
 5   detained."  I said, "We need to figure all this out."     12:50
 6   I said, "Just hang on one second for me."  And he said
 7   "Okay."
 8          So then I step out of the office.  And about
 9   that time, Gerrie Kincaid and, I believe, another
10   school official was with her.  They walked into Paul       12:50
11   Coon, who is the principal's office.  I went in there.
12   And I said, "Well, he has a firearm."  And they said,
13   you know, they were alarmed.  And I said, "Let me call
14   Sergeant Grubbs," I said, "because this is new to me.
15   He has a CCW permit, but he has a gun."  I don't -- I     12:50
16   just wasn't unsure -- I was unsure about the whole
17   situation.  So I stepped out and I called Sergeant
18   Grubbs.  He says, "I'm on my way right now."  I said,
19   "Sarge, he has a valid CCW permit and he said that he
20   had researched the 626.9 very clearly numerous times in   12:51
21   his career and, you know, he would -- Kent Williams
22   would still be in violation of having a firearm on
23   school grounds, that the 626.9 would not apply to him."
24   I said, "What do you want me to do?"  I said, "Well,
25   I'm going to be there right now."  He said, "Do you       12:51
                SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904
```

```
 1   have a Penal Code book?"  I said, "Yeah, I got one in
 2   my trunk."  He said, "Just pull it out."
 3              THE REPORTER:  You've got to slow down.
 4   You've got to slow down.  I am totally dropping.
 5              THE WITNESS:  Okay.  Sorry.  I'm going in          12:51
 6   conversation mode.  So I walk out to my trunk, pull out
 7   a 2014 Penal Code book, walk back into the office.  I
 8   go to the 626.9.  I'm kind of reading through it.  I
 9   don't see anything about CCW permits from what I was
10   reading in the short amount of time that I had to look   12:52
11   at it.
12              Sergeant Grubbs arrived a short time later.
13   He walked into the office with myself, Gerrie Kincaid,
14   Paul Coon, and I believe there was another staff member
15   from the school there, but I don't know who that person   12:52
16   was.  And I just explained to Sergeant Grubbs what we
17   had done up to that point.  He said "Okay."  He said,
18   "Well, go in there and advise him of his Miranda rights
19   and see if he wants to give you a statement."  So I
20   went in there and advised him of his Miranda rights.      12:52
21   He just said that, you know, that he didn't know he
22   wasn't supposed to have it, that he had brought it to
23   school most days with him.  He either kept it in
24   his backpack or in his vehicle.  And then I believe
25   somewhere in there is where the principal had told me     12:52
```

the statements that Kent Williams had made to him about
being on suicide watch and messed up in the head and
stuff of that nature.

I asked Kent Williams about those statements.
He did say that he was taking anxiety medication, but
he said he didn't feel like hurting himself. I said,
"Well, Kent," I said, "I know that you have six other
firearms registered to you." I said, "Do you have
those?" And he said, "Yes. They are at my house."
And I said, "Well, I don't -- I don't know how this
thing is going to progress, but I don't want you to get
out of jail and potentially try and hurt yourself or
something." I said, "Would you mind if we took those
guns?" And he said, "I totally understand or
absolutely I totally understand. You guys are more
than welcome to take them." So that's when we did the
consent-to-search form. I gave it to Officer McCarthy.
He left the office and I don't -- I don't know what
happened from there. But ultimately, they went to the
house and seized the firearms.

MR. MARDEROSIAN: Let Joel ask questions.

THE WITNESS: Yes. I'm sorry. I just wanted
to try to give you --

MR. MARDEROSIAN: That's okay. Good
background.

SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

1          Again, just if I can add real shortly.  When
2     I stepped out of the room, Officer McCarthy stayed in
3     the room with Kent Williams.  I walked like one office
4     over, and that was kind of the secondary location with
5     myself, the principal and Ms. Kincaid.                    01:02
6          Q.  At any point was Mr. Williams taken from his
7     office over to that secondary office where Ms. Kincaid
8     and Mr. Coon were?
9          A.  At the very, very end right before we left,
10    yes, sir.                                                 01:02
11         Q.  Okay.  And what happened when he was taken to
12    that office right before you left?
13         A.  Well, after Sergeant Grubbs showed up and we
14    had a conversation and, you know, I talked to Sergeant
15    Grubbs about what we were going to do at that point      01:02
16    because in with our department, you have to get arrest
17    approval from your sergeant.  He is my sergeant.
18         I asked him if we were going to forward it to
19    the D.A. and have them review it and see if they were
20    going to file charges or if it was actually going to be  01:02
21    we were going to arrest him and book him into the jail.
22         So Grubbs had made the decision that we were
23    going to be arresting him and booking him into the
24    jail.
25         I believe that Ms. Kincaid asked if she could      01:03
              SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

 1   have a five-minute conversation with him to put him on
 2   paid administrative leave or -- I don't know the exact
 3   terminology, which we didn't have a problem with.
 4        Q.   And before that conversation occurred with
 5   Ms. Kincaid, that's the point where Sergeant Grubbs had
 6   indicated to you that Mr. Williams was going to be
 7   arrested, correct?
 8        A.   Yes, sir.
 9        Q.   And did Sergeant Grubbs provide you any
10   explanation on his basis for the arrest in light of the
11   Penal Code section that was at play?
12        A.   Sergeant Grubbs said that he had reviewed the
13   626.9, and he did not believe that a CCW was included
14   in that anyway.  So that's why we were making the
15   arrest.
16        Q.   And when you were having a discussion with
17   Sergeant Grubbs at that point in time, did you yourself
18   have any opinions as to the applicability of that Penal
19   Code section?
20             MR. MARDEROSIAN:  He is not a lawyer and he
21   is not going to give any opinions on what the law may
22   provide.
23   /////
24   BY MR. ANDREESEN:
25        Q.   Did you express anything to Sergeant Grubbs

SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

1  vice principal or where he got the marijuana
2  information at.  But when he came back, that's when
3  that occurred.
4      Q.  And after Officer McCarthy left a second time
5  from the office, did he ever return to Tevis while you          01:10
6  were there?
7      A.  No, sir.
8      Q.  Did you end up transporting Mr. Williams from
9  Tevis to the downtown jail?
10     A.  Yes, sir.  Again, I can kind of go into a               01:11
11 narrative to save you questions.
12     Q.  If that would be okay with your attorney.
13         MR. MARDEROSIAN:  Sure.
14         THE WITNESS:  So Sergeant Grubbs advised him,
15 you know, that he was going to be going to the jail.  I         01:11
16 told him, "I'm not going to be putting handcuffs on
17 you.  We are going to walk out side by side out to my
18 car.  You are going to get in the back.  We are going
19 to drive away.  That way it doesn't look bad on you."
20 And he thanked us for that.                                     01:11
21         We walked out side by side.  I opened the
22 back door, he got in it.  I shut it.  I drove away,
23 almost into the same area that myself and Officer
24 McCarthy originally met and I opened the rear door.  I
25 don't even believe he got out of the car.  He just kind        01:11

         SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

1  of slid his hands to where I could get to him. I put
2  the cuffs on loosely. We drove to the jail.
3          When we got to the jail, I made contact with
4  a -- I believe it was a sergeant or lieutenant and
5  explained to them that, you know, this was kind of a          01:12
6  bad deal and if we could, by any chance, keep him away
7  from drunks or people that may be under the influence
8  or things of that nature. They said absolutely.
9          The nurse talked to him for a few minutes,
10 and he had a insulin pump on his stomach. So the nurse       01:12
11 said that he would need to be cleared by Kern Medical
12 Center staff. So we went back out to my car, drove to
13 Kern Medical Center.
14         When we got there, I asked for a back room
15 that we normally get away from the general public,           01:12
16 which they provided. When we got into that room, I
17 moved the cuffs to the front of him. I asked him if he
18 was hungry. He said yes. I stepped out just to where
19 I could still see him and asked if they could get me a
20 sandwich and some juice or something, which they             01:12
21 provided.
22         I took the handcuffs off of him, and we
23 probably were there close to an hour. And after he was
24 medically cleared, I brought him back to the jail and
25 booked him in.                                               01:13

               SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

BY MR. ANDREESEN:

 Q. Sure.

 A. When ultimately I went back to get him out of the jail, you know, he hugged me and thanked me and said, "Any lesser officer would have let me stay here."

  It was myself and another detective. I dropped that detective off. I was bringing Mr. Williams home. That's when he had talked about the Famoso Raceway again. He said, "You know, Coleman, I got plenty of money. You guys are good guys. It's not like I'm going to sue you or anything. I look forward to seeing you back at the school on Monday," you know.

  And then he had asked me what I was doing that night. I said, "I don't know." I said, "I'm probably going to be on this report for a while." And he said, you know, "I'm just glad to be not in jail. I'm going to bring my wife out to dinner. Would you and your wife like to join me?" I said, "Well, maybe some other time. This is kind of a big deal right now."

  He had made the comment to me that as a vice principal, that he had suspended kids before and only to later on find out that it was the wrong kid or he made a bad decision. He had to call the kid in. He said, "I understand mistakes happen."

01:14
01:14
01:14
01:14
01:15

```
 1          And I remember asking him specifically, I
 2   said, "Hey, if I've mistreated you in any way, then let
 3   Sergeant Grubbs know or call the chief."  And he said
 4   specifically "You guys treated me like royalty.  I
 5   appreciate everything you guys do.  You guys deserve a     01:15
 6   medal."  I remember all those stuff clear as day.
 7          Got to his house.  Again, he thanked me.  He
 8   walked up to his door, I drove away.
 9          He did tell me to call him.  He said, "Call
10   me tomorrow and maybe we can get together for lunch or     01:15
11   something like that."  I called him.  He didn't answer.
12   And that's when we were advised not to have any contact
13   with him anymore.
14       Q.  So you called Mr. Williams the next day,
15   August 29?                                                 01:15
16       A.  Yes.  I believe I called his cell phone
17   because it wasn't uncommon for him to, you know, if he
18   needed something at the school, he would call me.  It's
19   not uncommon for us to communicate that way.
20          Then I do remember talking to Sergeant            01:16
21   Grubbs.  He said, "Hey, did you talk to Mr. Williams at
22   all?  How is he doing?"  I said, "I tried to call him
23   and he didn't answer."  He said he received a call for
24   us not to try and talk to him no more, or something
25   along those lines.                                         01:16
```

```
 1   STATE OF CALIFORNIA      )

                             )    ss.

 2   COUNTY OF KERN           )

 3           I, Dawn Thompson, a Certified Shorthand

 4   Reporter in the State of California, holding

 5   Certificate No. 7517, do hereby certify that VERION

 6   COLEMAN, the witness named in the foregoing deposition,

 7   was by duly sworn; that said deposition was taken

 8   Friday, August 5, 2016, at the time and place set forth

 9   on the second page hereof.

10           That upon the taking of the deposition, the

11   words of the witness were written down by me in

12   stenotype and thereafter transcribed by computer under

13   my supervision; that the foregoing is a true and

14   correct transcript of the testimony given by the

15   witness.

16           I further certify that I am neither counsel

17   for, nor in any way related to any party to said

18   action, nor in any way interested in the result or

19   outcome thereof.

20           Dated this 9th day of August, 2016, at

21   Bakersfield, California.

22

23

24

25   _____
```

SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904

EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT/FRESNO DIVISION

---o0o---

KENT WILLIAMS,                          )
                                        )   Case No.
                                        )   1:14-CV-01955-JLT
                    Plaintiff,          )
                                        )
        vs.                             )
                                        )
CITY OF BAKERSFIELD, OFFICER            )
COLEMAN, OFFICER McCARTHY,              )
and DOES 1 TO 100, inclusive,           )
                                        )
                                        )
                    Defendants.         )
                                        )
                                        )


VIDEOTAPED DEPOSITION OF:


ANTHONY McCARTHY
FRIDAY, AUGUST 5, 2016
11:24 a.m.




Reported By:  Dawn Thompson, CSR No. 7517

responsible for responding to any incidents at schools?

     A.  I'm going to respond to any call for service
I have.  If it's at a school, then I would go to the
school.

     Q.  You were just part of the regular patrol in
August 2014, correct?

     A.  Correct.

     Q.  And if I may direct your attention to August
28, 2014.  You responded to a call at Tevis Junior High
in Bakersfield, correct?

     A.  I did.

     Q.  And that was a Thursday, correct?

     A.  It was.

     Q.  Earlier, you had told me your work schedule.
Were you working an overtime schedule or something that
day?

     A.  I was working collateral duty as a school
resource officer.

     Q.  In August 2014, how often were you working as
a school resource officer?

     A.  I worked from late January to October every
day except the weekends, which would be Saturday and
Sunday.

     Q.  And then on Saturday and Sunday you had other
duties?

```
 1        MR. ANDREESEN:  I'll give it back to you if

 2   you want to look at it.

 3        MR. MARDEROSIAN:  That's okay.  I'll just put

 4   a one on it, put it over there.  I'm good.  There we

 5   go.  Right after, we will just start with Coleman?          12:03

 6        MR. ANDREESEN:  Yes.

 7        MR. MARDEROSIAN:  He is ready to go, too.

 8   BY MR. ANDREESEN:

 9        Q.  When we left off, we had begun talking about

10   your interaction with Mr. Williams at Tevis Junior          12:04

11   High, Tevis Junior High middle school, on August 28,

12   2014.

13            Can you tell me what your role was once you

14   got to Tevis Middle School on August 28th, what you

15   did?                                                        12:04

16        A.  Two separate questions.  What my role was or

17   what I did?  Which one do you want now?

18            MR. MARDEROSIAN:  Just tell him what you did.

19   He will figure it out from there.  We are trying to get

20   you out of here.                                            12:04

21            THE WITNESS:  I'm working on it.

22            I ended up securing the weapon.  And at the

23   direction of Senior Officer Coleman, I went to Kent

24   Williams' residence where he was voluntarily

25   surrendering the rest of the weapons he had, and I          12:04
```

1    <u>seized those.</u>

2    BY MR. ANDREESEN:

3        Q.   And what weapon did you secure?

4        A.   It was a .45 caliber.  I believe it was a

5    Glock.                                              12:05

6        Q.   And prior to securing that weapon, as I

7    understand it, Mr. Williams was asked if he had a gun

8    with him, correct?

9            MR. MARDEROSIAN:  We are at the school now,

10   right?                                              12:05

11           MR. ANDREESEN:  At the school, yes.

12           THE WITNESS:  Yes.

13   BY MR. ANDREESEN:

14       Q.   And Mr. Williams directed you to where the

15   weapon was, correct?                                12:05

16       A.   Not initially.

17       Q.   Okay.  What happened initially?

18       A.   Initially, I am standing to -- I am standing

19   to his left.  Officer Coleman is standing on the other

20   side of his desk.  Officer Coleman asked him if he had  12:05

21   a weapon with him on campus, and he reached -- he says,

22   "Yeah, right here."  He reaches down with his left hand

23   to an open backpack that's near my feet.  And I stop

24   him at that point and tell him not to reach for it.

25   And Officer Coleman tells him, "Hey, you know, McCarthy  12:06

```
 1        Q.  When you got to the residence, you went up,
 2    knocked on the front door or rang the doorbell,
 3    correct?
 4        A.  Correct.
 5        Q.  And Mrs. Williams responded?                    12:14
 6        A.  Yes.
 7        Q.  Was anybody else at the house other than
 8    Mrs. Williams?
 9        A.  Not that I recall.
10        Q.  And did you say anything to Mr. --            12:14
11    Mrs. Williams as you greeted her at the door?
12        A.  Could you be more specific?
13        Q.  What did you do once you got to the house?
14        A.  Gave her a synopsis on what was -- what was
15    happening with her husband, told her that he had given  12:15
16    us consent to come in and seize whatever weapons were
17    inside the residence.  She led us to -- and I -- I
18    don't even recall the direction of the house, but it
19    was off to the left, a small room off to the left.  We
20    seized the weapons.  I wrote her a property receipt for 12:15
21    the weapons that we seized and we left.
22        Q.  How long were you at the residence?
23        A.  Oh, gosh, maybe 20 minutes, 25 maybe.
24        Q.  When you went to where the weapons were
25    located, were the weapons in a safe?                   12:15
              SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904
```

```
 1   STATE OF CALIFORNIA        )
                                )    ss.
 2   COUNTY OF KERN             )

 3           I, Dawn Thompson, a Certified Shorthand

 4   Reporter in the State of California, holding

 5   Certificate No. 7517, do hereby certify that ANTHONY

 6   McCARTHY, the witness named in the foregoing

 7   deposition, was by duly sworn; that said deposition was

 8   taken Friday, August 5, 2016, at the time and place set

 9   forth on the second page hereof.

10           That upon the taking of the deposition, the

11   words of the witness were written down by me in

12   stenotype and thereafter transcribed by computer under

13   my supervision; that the foregoing is a true and

14   correct transcript of the testimony given by the

15   witness.

16           I further certify that I am neither counsel

17   for, nor in any way related to any party to said

18   action, nor in any way interested in the result or

19   outcome thereof.

20           Dated this 9th day of August, 2016, at

21   Bakersfield, California.

22

23

24           _____

             Dawn Thompson, CSR No. 7517

25

         SYLVIA MENDEZ & ASSOCIATES - (661) 631-2904
```

EXHIBIT I

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

KENT WILLIAMS,                         )
                                       )
            Plaintiff,                 )        Case No.
                                       )
      vs.                              )        1:14-CV-01955-JLT
                                       )
CITY OF BAKERSFIELD,                   )
OFFICER COLEMAN, OFFICER               )
McCARTHY, and DOES 1 to                )
100, inclusive,                        )
                                       )
            Defendants.                )
_____)


VIDEOTAPED DEPOSITION OF:


SERGEANT JOSEPH EDWARD GRUBBS


MONDAY, MAY 2, 2016


1:29 P.M.


Reported By:  Sylvia Mendez, CSR No. 7636, RPR

1      A.  Yes, I was.

2      Q.  And were you also, uhm, a Sergeant who had

3   responsibility of supervising the school resource

4   officers?

5      A.  Yes.                                          01:38

6      Q.  Did your supervision of the school resource

7   officers include officers that, uhm, may have responded

8   to Tevis Junior High School here in Bakersfield?

9      A.  Yes.

10     Q.  And if I can direct your attention now to      01:38

11  late August of 2014, and specifically August the 28th,

12  2014, did you respond to Tevis Junior High on that day

13  for purposes of any investigation there?

14     A.  Yes, I did.

15     Q.  Do you remember approximately what time you    01:38

16  responded there?

17     A.  No, I don't.

18     Q.  Do you remember how you became aware of an

19  incident there at Tevis Junior High on that day?

20     A.  As I recall, Officer Coleman --               01:39

21  Senior Officer Coleman called me.

22     Q.  Was Officer Coleman one of the officers

23  assigned as part of the School Resource Officer

24  Program?

25     A.  Yes.                                          01:39

```
 1   that Mr. Williams carried a gun onto school property
 2   before that day?
 3         A.   Uhm, I don't recall specifically if I did.
 4         Q.   You also mentioned that you spoke with, uhm,
 5   Gerrie Kincaid on the telephone?                        01:44
 6         A.   Yes.
 7         Q.   What did you speak with her about?
 8         A.   Just, uhm, some concerns that she had about
 9   Mr. Williams' mental health and well-being and a
10   concern about a violation of their school policy with   01:44
11   Mr. Williams having that firearm on campus.
12         Q.   And what did she say about her concerns of
13   Mr. Williams' mental health?
14         A.   Just that there -- generally speaking, that
15   there were some concerns about what he might do with    01:45
16   that firearm and how him having that firearm on campus
17   could be a danger to their kids.
18         Q.   Did Ms. Kincaid ever come to Tevis Junior
19   High after you arrived on-scene on August 28, 2014?
20         A.   Not that I recall.                           01:45
21         Q.   Did you speak with anybody else from the
22   Panama-Buena Vista School District?
23         A.   No, I did not.
24         Q.   You also mentioned that Officer McCarthy was
25   on-scene; is that correct?                              01:45
```

```
 1   there was going to be an arrest.  And because it's a
 2   school and it's -- those are delicate issues.
 3   BY MR. ANDREESEN:
 4       Q.  Who was the Officer in Charge on August 28,
 5   2000 --                                                     01:48
 6       A.  I don't recall.
 7       Q.  At some point while you were at the school on
 8   August 28, 2014, was the decision made to arrest
 9   Mr. Williams?
10       A.  Yes.                                               01:48
11       Q.  Who made the decision to arrest?
12       A.  I did.
13       Q.  And what was the basis of that decision to
14   arrest?
15           MR. MARDEROSIAN:  Just object.  May call for      01:49
16   a legal conclusion and opinion.
17           Go ahead.
18           THE WITNESS:  My reading of the Penal Code
19   626.9 at the time.
20   BY MR. ANDREESEN:                                          01:49
21       Q.  And what was your interpretation of the
22   Penal Code at that time?
23           MR. MARDEROSIAN:  Object.  It may call for a
24   legal opinion and conclusion.
25           THE WITNESS:  My interpretation was, is that      01:49
```

```
 1  he, a CCW permit holder, could not have a firearm on
 2  the school campus.
 3  BY MR. ANDREESEN:
 4      Q.  And at some point during the investigation,
 5  was Mr. Williams asked if he had a CCW permit?          01:49
 6      A.  Yes.
 7      Q.  And did he show that to you, to any officers
 8  there?
 9      A.  I can't say how exactly that happened.  I can
10  say, when I got to the school, I had knowledge, and I   01:49
11  don't know exactly.  I think Officer Cole- --
12  Senior Officer Coleman told me that he had a CCW
13  permit.  So that was not a question.
14      Q.  Did you at some time, while you were at the
15  school, read the Penal Code section?                    01:50
16      A.  Yes.
17      Q.  And while you were at the school, did you
18  talk with anybody else about your interpretation of
19  that Penal Code section?
20      A.  Oh, I think Senior Officer Coleman and I        01:50
21  talked about it, yes.
22      Q.  Did you notify Mr. Williams, yourself, that
23  he was going to be placed under arrest?
24      A.  I don't think so.  I think Officer Coleman
25  did.                                                    01:50
```

1      A.  No.

2      Q.  Do you know who transported Mr. Williams from

3  the scene?

4      A.  I don't know whether it was

5  Senior Officer Coleman or Officer McCarthy.          01:53

6      Q.  After you left the school on August 28, 2014,

7  what, if anything, further did you do as part of your

8  investigation into this case?

9      A.  Uhm, nothing.  Nothing else until I was

10  contacted by Senior Officer Coleman.                 01:54

11      Q.  And when were you next contacted by

12  Senior Officer Coleman?

13      A.  It was later that same day.  I don't recall

14  exactly what time.  It was before four o'clock.

15      Q.  And what did Officer Coleman tell you when he  01:54

16  contacted you later that day?

17      A.  He told me that we -- he thought that there

18  may have been an issue with the arrest.

19      Q.  And what did you ask him about that?

20      A.  Well, he had come to my office.  He and I      01:54

21  looked, reviewed again the -- the Penal Code,

22  specifically 626.9, and found that there was an

23  exception for a CC -- a valid CCW permit holder to have

24  a firearm on a school campus.

25      Q.  Did that discussion occur in your office?      01:55

1    have.
2    BY MR. ANDREESEN:
3         Q.   And once you came to that conclusion, did you
4    instruct Officer Coleman to release Mr. Williams?
5         A.   Yeah -- yes, I did.                          01:56
6         Q.   Were you ever made aware, sir, that
7    Mr. Williams had gone to Kern Medical Center sometime
8    after he was placed under arrest?
9         A.   Yes.
10        Q.   Did you accompany Mr. Williams to             01:56
11   Kern Medical Center?
12        A.   No.
13        Q.   After speaking with Officer Coleman later in
14   the afternoon on August 28, 2014, how soon was
15   Mr. Williams released?                                 01:57
16        A.   I can't say the exact time, but, uhm, that's
17   of immediate concern, and I told Officer Coleman to go
18   down and get him out of jail immediately.
19        Q.   And what jail was he located at?
20        A.   Downtown Kern County Jail, Central Receiving. 01:57
21        Q.   Did you accompany Officer Coleman to the
22   Downtown Jail?
23        A.   No, I did not.
24        Q.   When Officer Coleman came to you, uhm, later
25   in the afternoon on August 28, 2014, and had a question 01:57

1    A.  Yes, I do.

2    Q.  It says:  "Sergeant Grubbs, No. 719."

3        Is that your badge number?

4    A.  Yes.

5    Q.  The next sentence says:                              02:01

6        "After further review of the California

7    Gun Free Zone Act and consultation with the Kern

8    County California District Attorney's Officer --"

9    I think you mean "Office" "-- Sergeant Grubbs and

10   I have determined that it does not appear to be a    02:02

11   violation of the Act."

12       Did you ever contact the Kern County

13   California District Attorney's Office?

14       A.  I believe I did, yes.

15   Q.  Did --                                             02:02

16   A.  Well, we had talked about it -- I said that

17   in the media -- but I don't have recollection of who I

18   spoke to.

19   Q.  Do you have a recollection of anything you

20   spoke with -- anything you spoke about with someone at   02:02

21   the Kern County District Attorney's Office?

22   A.  No.

23   Q.  Did someone from the Kern County District

24   Attorney's Office tell you that it was legal, under

25   Penal Code Section 626.9, for someone to carry a CC --   02:03

1    A.  -- somewhere around in that number.

2    Q.  Were those guns seized before you made the

3    decision to arrest Mr. Williams, or was this after he

4    was, uh, arrested and booked into the Kern County Jail?

5    A.  Kind of, because that's a long --                    02:15

6    Q.  Approximate --

7    A.  -- frame of time.  So kind of concurrently

8    with, uhm, decided to arrest him; but during the course

9    of that, we also obtained his consent to go seize those

10   firearms.                                                02:16

11   Q.  When he was ultimately released and after

12   that period of time, did you make an effort to return

13   those guns to Mr. Williams?

14   A.  I made at least a couple of calls -- I

15   believe two calls -- to the home.                        02:16

16   Q.  And tell us about that:  What -- what did you

17   do in an effort to return those guns to Mr. Williams?

18   A.  Well, there is -- uhm, when we seize guns,

19   even as safekeeping, for a person to get them back,

20   there's a charge.  They have to go through a -- through  02:16

21   the D.O.J. -- and I don't recall exactly what the

22   charge was, but there was a way that, through the

23   Police Department, we can work it through one of our

24   local gun dealers to get those guns back to them; and

25   then I obtain permission to -- for the City or the       02:17

1    <u>Police Department to absorb the cost of returning those</u>

2    <u>guns back to him.</u>

3          <u>So I had that set up.  However, when I</u>

4    <u>called the home, uhm -- and I don't know that it was</u>

5    <u>Mr. Williams' wife or exactly who it was, but as I</u>          02:17

6    <u>recall, it was a female, uhm, who told me that we would</u>

7    <u>have to speak to his attorney, and just kind of left it</u>

8    <u>at that.</u>

9          Q.  Okay.  The report, Exhibit 2, on Page 6, goes

10   on to state that:                                                02:17

11          "I made contact with Kincaid, who arrived at

12          the school.  She stated the District never gave

13          Williams permission to carry a firearm on school

14          grounds, and he never requested to."

15          Let's stop right there.                                   02:17

16          I assume that you had that information

17   available to you; you knew of that fact before you made

18   the decision to arrest Mr. Williams --

19          A.  Yes.

20          Q.  -- correct?                                           02:17

21          MR. ANDREESEN:  Objection.  Vague and

22   ambiguous as to time.

23   BY MR. MARDEROSIAN:

24          Q.  Meaning before you made the decision to

25   arrest Mr. Williams, you were aware that -- that          02:18

```
 1   school campus.
 2           Is that -- is that your understanding today?
 3        A.  Yes.
 4        Q.  But that was after the arrest of -- after you
 5   made the decision to arrest Mr. Williams; is that          02:21
 6   right?
 7        A.  That's right.
 8        Q.  Now, you -- you knew, when you made the
 9   decision to -- strike that.
10           Your state of mind, at the time you made the       02:21
11   decision to arrest Mr. Williams, was:  It was
12   impermissible for anyone to have a gun on campus;
13   is that correct?
14        A.  It was impermissible for a CCW permit holder
15   to have a gun on campus.                                   02:22
16        Q.  Right.  Okay.
17           And -- and the -- the moment that you felt
18   that that information or that state of mind was
19   incorrect, you put in play the efforts to immediately
20   have Mr. Williams released; is that correct?               02:22
21        A.  Yes.
22        Q.  All right.  Now, at the time that you made
23   the decision to arrest Mr. Williams, you -- you knew
24   that he had a weapon with live rounds and two
25   magazines, and one of the magazines in the Glock           02:22
```

1  objecting to that last question.

2  BY MR. MARDEROSIAN:

3      Q.  At the time that you made the decision to

4  arrest Mr. Williams, what information do you -- did you

5  have in your mind about his emotional state?                02:23

6      A.  That he was unstable; that there was some

7  history of -- and I don't know to what degree -- but

8  some history of mental health issues.

9          Uhm, and as I was there, the totality of

10 everything that I knew led me to have concerns about        02:24

11 him, in particular, having -- beyond anybody else, but

12 him, in particular, having a firearm on campus.

13     Q.  Was there any question in your mind, at the

14 time that you made the decision to arrest Mr. Williams,

15 that -- that the gun had to be removed from the -- the     02:24

16 school campus?

17     A.  None at all.

18     Q.  Was there any question in your mind, at the

19 time that you made the decision to arrest Mr. Williams,

20 that he had to be taken off at that time from the           02:24

21 school campus, removed from the school campus?

22     A.  No, none at all.

23     Q.  And was this for the safety of the students

24 and others on the campus that you made this -- this

25 particular decision?                                        02:25

1      A. Yes. And in addition to his safety. And my
2  decision to take that firearm, my decision to take his
3  other firearms was also for his safety, as well.
4      Q. The later review of the Penal Code section
5  that we spoke about, 626.9 and the discovery of the --      02:25
6  this exception, the first time that you -- you looked
7  through it, uh, did -- did you -- did you miss it
8  purposely, or was it -- was it just an error, a mistake
9  that you made in performing your duties as a law
10 enforcement officer?                                        02:25
11     A. I did not miss it purposely. I missed it.
12 Certainly not purposely.
13     Q. You put it into the category of a "reasonable
14 mistake"?
15     A. Yes.                                                 02:26
16     Q. From a -- from a practical standpoint, not a
17 legal standpoint, because you're not a lawyer, but from
18 a practical standpoint, was there any doubt in your
19 mind that that gun and Mr. Williams had to be removed
20 from the campus that day, based on the information you      02:26
21 had available to you?
22     A. No question whatsoever.
23     MR. MARDEROSIAN: All right. That's all I
24 have.
25 ///                                                         02:26

```
1    STATE OF CALIFORNIA      )
                              )      ss.
2    COUNTY OF KERN           )

3

4           I, Sylvia Mendez, a Certified Shorthand

5    Reporter in the State of California, holding

6    Certificate No. 7636, RPR, do hereby certify that

7    JOSEPH EDWARD GRUBBS, the witness named in the

8    foregoing deposition, was by me duly sworn; that said

9    deposition was taken Monday, May 2, 2016, at the time

10   and place set forth on the second page hereof.

11          That upon the taking of the deposition, the

12   words of the witness were written down by me in

13   stenotype and thereafter transcribed by computer under

14   my supervision; that the foregoing is a true and

15   correct transcript of the testimony given by the

16   witness.

17          I further certify that I am neither counsel

18   for, nor in any way related to any party to said

19   action, nor in any way interested in the result or

20   outcome thereof.

21          Dated this 25th day of May, 2016, at

22   Bakersfield, California.

23

24   _____

          Sylvia Mendez, CSR No. 7636, RPR

25
```

EXHIBIT J

1   Michael G. Marderosian, No. 077296
    Heather S. Cohen, No. 263093
2   MARDEROSIAN, CERCONE & COHEN
    1260 Fulton Mall
3   Fresno, CA 93721
    Telephone: (559) 441-7991
4   Facsimile: (559) 441-8170

5   Virginia Gennaro, No. 138877
    City Attorney
6   CITY OF BAKERSFIELD
    1501 Truxtun Avenue
7   Bakersfield, CA 93301
    Telephone: (661) 326-3721
8   Facsimile: (661) 852-2020

9   Attorneys for: Defendants CITY OF BAKERSFIELD, OFFICER VERION COLEMAN (sued
            herein as OFFICER COLEMAN) and OFFICER ANTHONY McCARTHY (sued
10          herein as OFFICER McCARTHY)

11

12                          UNITED STATES DISTRICT COURT

13                      EASTERN DISTRICT / FRESNO DIVISION

14   KENT WILLIAMS,                    )   Case No. 1:14-CV-01955-JLT
                                       )
15                  Plaintiff,         )   **RESPONSES TO REQUEST FOR**
                                       )   **PRODUCTION OF DOCUMENTS,**
16          v.                         )   **SET ONE**
                                       )
17   CITY OF BAKERSFIELD, OFFICER      )
     COLEMAN, OFFICER McCARTHY,        )
18   and DOES 1 to 100, inclusive,     )
                                       )   *Trial Date: May 2, 2017*
19                  Defendants.        )
                                       )
20   _____  )

21   PROPOUNDING PARTY    :   Plaintiff KENT WILLIAMS

22   RESPONDING PARTY     :   Defendant CITY OF BAKERSFIELD

23   SET NUMBER           :   ONE (1)

24          COMES NOW Defendant CITY OF BAKERSFIELD and provides the following response to

25   the Request for Production, Set One, propounded by Plaintiff KENT WILLIAMS as follows:

26                          **PRELIMINARY STATEMENT**

27          This preliminary statement is intended as a clarification as to the present status of the litigation

28   and discovery therein, and is intended to be included, individually, in each and every response to each

     and every included request for production.

MARDEROSIAN,
CERCONE & COHEN
1260 FULTON MALL
FRESNO, CA 93721

1     This responding party has not fully completed its investigation and discovery of the factual

2     basis for this litigation and/or completed its trial preparation. Investigation and discovery in this

3     matter are continuing and, therefore, all the facts and issues involved in this litigation may not yet be

4     known, and if known, may not be fully or correctly understood. The following responses are made

5     based upon the information in the possession of responding party at the time these responses were

6     prepared. These responses are provided without prejudice to further discovery, and discovery will

7     continue as long as permitted by statute or stipulation of the parties. Responding party specifically

8     reserves the right at the time of trial to introduce any evidence, from any source, which may hereafter

9     be discovered. Responding party additionally reserves the right to change any response provided

10    herein as additional facts are ascertained and legal issues are more fully understood.

11    The responses contained herein are made in a good faith effort to comply with the propounding

12    party's request for production of documents, but are in no manner intended to prejudice responding

13    party with respect to future discovery, research or analysis. If any information and documentation has

14    been unintentionally omitted from these responses, responding party reserves the right to apply for

15    relief so as to permit the insertion of the omitted data into these responses.

16    All evidentiary objections contained in these responses are reserved. To the extent that

17    responding party might arguably waive any otherwise assertable objection, claim or privilege, such

18    waiver shall be limited to this response only and shall not extent to any further discovery, request or

19    subpoena.

20    These introductory comments shall apply to all responses provided herein and shall be

21    incorporated herein by reference as though fully set forth in each and every response.

22    **RESPONSES TO REQUEST FOR PRODUCTION**

23    REQUEST FOR PRODUCTION NO. 1:

24    Please produce all DOCUMENTS identified in YOUR Rule 26 Disclosure.

25    RESPONSE:

26    The documents that Defendants are able to lawfully produce were produced at the time the

27    Rule 26 Disclosure was served. The Plaintiff was advised more than a year ago that in order for his

28    property to be returned, he had to complete paperwork that is required by the Department of Justice.

1   The Plaintiff was advised that the Bakersfield Police Department could provide him with the necessary

2   paperwork, however, the Plaintiff never obtained the paperwork from the Bakersfield Police

3   Department and never submitted the paperwork to the Department of Justice.   Once the Plaintiff

4   submits the necessary paperwork to the Department of Justice, the Department of Justice can approve

5   the release of Plaintiff's weapons.  Until that time, the law precludes Defendants from returning the

6   subject weapons until the Plaintiff completes the subject paperwork.

7   Dated: October 13, 2015                    MARDEROSIAN, CERCONE & COHEN

8

9                                              By:_____

10                                                 Michael G. Marderosian,
                                                   Attorney for Defendants above-named.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF FRESNO

    I am employed in the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is 1260 Fulton Mall, Fresno, California 93721.

    On October 13, 2015, I served the within **RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE** on the interested parties in said action, as listed below:

**ATTORNEY:**

Chantal Trujillo, Esq.
RODRIGUEZ & ASSOCIATES
2020 Eye Street
Bakersfield, CA 93301
Telephone: (661) 323-1400
Facsimile: (661) 323-0132
Email: chantal@rodriguezlaw.net

**PARTY:**

Plaintiff KENT WILLIAMS

| | | |
|---|---|---|
| ☒ | Via U.S. Mail: | I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. The practice is to deposit correspondence with the United States Postal Service the same day it is placed for mailing in the ordinary course of business. I placed the envelope(s), with postage prepaid, for collection and processing for mailing following said practice. (C.C.P. § 1013, *et seq.*) |
| ☐ | Via Hand Delivery: | I caused the document(s) listed above to be served via hand delivery to the address(es) listed above. (C.C.P. § 1013, *et seq.*) |
| ☐ | Via Overnight Courier: | I caused the document(s) listed above to be served by overnight courier to the address(es) listed above. (C.C.P. § 1013, *et seq.*) |
| ☐ | Via Facsimile: | I served the document(s) listed above via facsimile transmission to the number(s) listed above. (C.C.P. § 1013, *et seq.*) |
| ☐ | Via Email: | I served the document(s) listed above via electronic transmission to the email address(es) listed above. |
| ☐ | State: | I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. |
| ☒ | Federal: | I declare that I am employed in the office of a member of the bar of this court at whose direction service was made. |

    Executed on October 13, 2015, at Fresno, California.

Kate Holly

EXHIBIT K


# Property Related Image(s) - Receipt,Property

Attachment Description: **WILLIAMS, KENT**
Reference Number:

## PROPERTY RECEIPT

Bakersfield Police Department
1601 Truxtun Avenue
Bakersfield, CA 93301
PHONE (661) 326-9802

Officer / I.D. McCARTHY #1051
Case No. 14-188720

| DATE | OWNER |
|---|---|
| 8/28/14 | KENT WILLIAMS |

DESCRIPTION OF PROPERTY

1) S+W scr # HBN1949 M79C; 2) S+W A474205 MOD 59;
3) RUGGER .22cal scr # 174454; 4) ITHICA M11 45cal # 2052098;
5) REMINGTON 870 # RS66836B; 6) REMINGTON 870 # 624914V

You may contact the Property Room between 8:00 a.m. and 4:00 p.m. Monday through Friday, except holidays, regarding release of the property. Release of the property may be restricted by law. Call before responding to claim property. Found property will be released or disposed of after 90 days. Property taken for safekeeping must be picked up within 60 days. If you send an agent on your behalf, they must have notarized authorization from you to obtain the property. (KBF-8172) PO 21-0009B

EXHIBIT L

DANIEL RODRIGUEZ, ESQ., SBN 096625
JOEL T. ANDREESEN, ESQ., SBN 152254
CHANTAL A. TRUJILLO, ESQ., SBN 289493
**RODRIGUEZ & ASSOCIATES**
**A PROFESSIONAL LAW CORPORATION**
2020 Eye Street
Bakersfield, CA 93301
Tel. No.:     (661) 323-1400
Fax No.:     (661) 323-0132

Attorneys for Plaintiff
KENT WILLIAMS

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENT WILLIAMS,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>CITY OF BAKERSFIELD, OFFICER COLEMAN, OFFICER McCARTHY and DOES 1 to 100, Inclusive,<br><br>　　　　　　　Defendants. | Case No. 1:14-CV-01955-JLT<br><br>**PLAINTIFF, KENT WILLIAM'S RESPONSE TO SPECIAL INTERROGATORIES, (SET ONE)** |

**PROPOUNDING PARTY**　　:　　**DEFENDANT, CITY OF BAKERSFIELD**

**RESPONDING PARTY**　　:　　**PLAINTIFF, KENT WILLIAMS**

**SET NO.**　　　　　　:　　**ONE (1)**

COMES NOW, Plaintiff, KENT WILLIAMS, and provides a response to Special Interrogatories (Set One) as follows:

## **PRELIMINARY STATEMENT**

It should be noted that plaintiff has not fully completed his investigation of the facts relating to this case, has not fully completed his discovery in this action, and has not completed his preparation for trial. All of the answers contained herein are based only upon such information and documents as are presently available to, and specifically known to, plaintiff and disclose only those contentions which presently occur to plaintiff. It is anticipated that further discovery, independent investigation, legal research, and analysis will supply additional facts and/or add meaning to the known facts as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions herein set forth.

The following responses are given without prejudice to plaintiff's right to produce evidence of any subsequently discovered fact or facts which plaintiff may later recall. Plaintiff accordingly reserves the right to change any and all responses herein as additional facts are ascertained, analyses are made, legal research is completed, and contentions are made. The responses contained herein are made in a good faith effort to supply as much factual information and as much specification of legal contentions as is

presently known but should in no way be to the prejudice of plaintiff in relation to further discovery, research, or analysis.

## RESPONSES

### SPECIAL INTERROGATORY NO. 1:

Please state all facts RELATING TO YOUR first cause of action for arrest, seizure and unreasonable and excessive use of force in violation of the Fourth Amendment against the City of Bakersfield as set forth in YOUR COMPLAINT.

### RESPONSE NO. 1:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant City of Bakersfield instructed and allowed its employees, more specifically Officers Coleman and McCarthy to detain, arrest and then book me knowing I had not committed a crime and without reasonable suspicion.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 2:

Please state all facts RELATING TO YOUR first cause of action for arrest, seizure and unreasonable and excessive use of force in violation of the Fourth Amendment against Verion Coleman as set forth in YOUR COMPLAINT.

## RESPONSE NO. 2:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer Coleman detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 3:

Please state all facts RELATING TO YOUR first cause of action for arrest, seizure and unreasonable and excessive use of force in violation of the Fourth Amendment against Anthony McCarthy as set forth in YOUR COMPLAINT.

## RESPONSE NO. 3:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer McCarthy detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 4:

Please IDENTIFY all PERSONS with knowledge RELATING TO YOUR first cause of action for arrest, seizure and unreasonable and excessive use of force in violation of the Fourth Amendment as set forth in YOUR COMPLAINT.

## RESPONSE NO. 4:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

1. Defendant Officers;

2. BPD Detective Galland;

3. Tina Williams;

4. BPD Sgt. Hearron;

5. Gerrie Kincaid;

6. Nurse at KMC (name unknown).

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 5:**

Please state all facts RELATING TO YOUR second cause of action for violation of the right to bear arms under the Second Amendment against the City of Bakersfield as set forth in YOUR COMPLAINT.

**RESPONSE NO. 5:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendants knew I had not committed a crime, and did not have reasonable suspicion of such. Further Defendants knew I had a CCW but seized my Glock anyway. Finally,

Defendants went to my home and seized the guns I legally owned that were stored in my safe. Defendants did this by misleading my wife saying I authorized their entry and seizure of my guns. Defendants did this without reasonable suspicion, probable cause, warrant, and without consent.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 6:**

Please state all facts RELATING TO YOUR second cause of action for violation of the right to bear arms under the Second Amendment against Verion Coleman as set forth in YOUR COMPLAINT.

**RESPONSE NO. 6:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendants knew I had not committed a crime, and did not have reasonable suspicion of such. Further Defendants knew I had a CCW but seized my Glock anyway. Finally, Defendants went to my home and seized the guns I legally owned that were stored in my safe. Defendants did this by misleading my wife saying I authorized their entry and seizure

of my guns. Defendants did this without reasonable suspicion, probable cause, warrant, and without consent.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 7:

Please state all facts RELATING TO YOUR second cause of action for violation of the right to bear anus under the Second Amendment against Anthony McCarthy as set forth in YOUR COMPLAINT.

## RESPONSE NO. 7:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendants knew I had not committed a crime, and did not have reasonable suspsicion of such. Further Defendants knew I had a CCW but seized my Glock anyway. Finally, Defendants went to my home and seized the guns I legally owned that were stored in my safe. Defendants did this by misleading my wife saying I authorized their entry and seizure of my guns. Defendants did this without reasonable suspicion, probable cause, warrant, and without consent.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 8:**

Please IDENTIFY all PERSONS with knowledge RELATING TO YOUR second cause of action for violation of the right to bear an-ns under the Second Amendment as set forth in YOUR COMPLAINT.

**RESPONSE NO. 8:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

1. Defendant Officers;

2. BPD Detective Galland;

3. Tina Williams;

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 9:**

Please state all facts RELATING TO YOUR third cause of action for deprivation of YOUR property without due process of law in violation of the Fourteenth Amendment against the City of Bakersfield as set forth in YOUR COMPLAINT.

**RESPONSE NO. 9:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendants knew I had not committed a crime, and did not have reasonable suspicion of such. Further Defendants knew I had a CCW but seized my Glock anyway. Finally, Defendants went to my home and seized the guns I legally owned that were stored in my safe. Defendants did this by misleading my wife saying I authorized their entry and seizure of my guns.

Defendants did this without reasonable suspicion, probable cause, warrant, and without consent.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 10:**

Please state all facts RELATING TO YOUR third cause of action for deprivation of YOUR property without due process of law in violation of the Fourteenth Amendment against Verion Coleman as set forth in YOUR COMPLAINT.

**RESPONSE NO. 10:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendants knew I had not committed a crime, and did not have reasonable suspicion of such. Further Defendants knew I had a CCW but seized my Glock anyway. Finally, Defendants went to my home and seized the guns I legally owned that were stored in my safe. Defendants did this by misleading my wife saying I authorized their entry and seizure of my guns.

Defendants did this without reasonable suspicion, probable cause, warrant, and without consent.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 11:

Please state all facts RELATING TO YOUR third cause of action for deprivation of YOUR property without due process of law in violation of the Fourteenth Amendment against Anthony McCarthy as set forth in YOUR COMPLAINT.

## RESPONSE NO. 11:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendants knew I had not committed a crime, and did not have reasonable suspicion of such. Further Defendants knew I had a CCW but seized my Glock anyway. Finally, Defendants went to my home and seized the guns I legally owned that were stored in my safe. Defendants did this by misleading my wife saying I authorized their entry and seizure of my guns.

Defendants did this without reasonable suspicion, probable cause, warrant, and without consent.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 12:**

Please IDENTIFY all PERSONS with knowledge RELATING TO YOUR third cause of action for deprivation of YOUR property without due process of law in violation of the Fourteenth Amendment as set forth in YOUR COMPLAINT.

**RESPONSE NO. 12:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

4. Defendant Officers;

5. BPD Detective Galland;

6. Tina Williams;

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 13:**

Please state all facts RELATING TO YOUR fourth cause of action for violation of The Ralph Civil Rights Act against the City of Bakersfield as set forth in YOUR COMPLAINT.

## RESPONSE NO. 13:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 14:

Please state all facts RELATING TO YOUR fourth cause of action for violation of The Ralph Civil Rights Act against Verion Coleman as set forth in YOUR COMPLAINT.

## RESPONSE NO. 14:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer Coleman detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 15:**

Please state all facts RELATING TO YOUR fourth cause of action for violation of The Ralph Civil Rights Act against Anthony McCarthy as set forth in YOUR COMPLAINT.

**RESPONSE NO. 15:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer McCarthy detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 16:**

Please IDENTIFY all PERSONS with knowledge RELATING TO YOUR fourth cause of action for violation of The Ralph Civil Rights Act as set forth in YOUR COMPLAINT.

## RESPONSE NO. 16:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

1. Defendant Officers;

2. BPD Detective Galland;

3. Tina Williams;

4. Gerrie Kincaid;

5. Nurse at KMC (name unknown).

QDiscovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 17:

Please state all facts RELATING TO YOUR fifth cause of action for violation of The Unruh Civil Rights Act against the City of Bakersfield as set forth in YOUR COMPLAINT.

## RESPONSE NO. 17:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client

privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant City of Bakersfield instructed and allowed its employees, more specifically Officers Coleman and McCarthy to detain, arrest and then book me knowing I had not committed a crime and without reasonable suspicion.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 18:**

Please state all facts RELATING TO YOUR fifth cause of action for violation of The Unruh Civil Rights Act against Verion Coleman as set forth in YOUR COMPLAINT.

**RESPONSE NO. 18:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer Coleman detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 19:

Please state all facts RELATING TO YOUR fifth cause of action for violation of The Unruh Civil Rights Act against Anthony McCarthy as set forth in YOUR COMPLAINT.

## RESPONSE NO. 19:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer McCarthy detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 20:

Please IDENTIFY all PERSONS with knowledge RELATING TO YOUR fifth cause of action for violation of The Unruh Civil Rights Act as set forth in YOUR COMPLAINT.

## RESPONSE NO. 20:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client

privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

1. Defendant Officers;

2. BPD Detective Galland;

3. Tina Williams;

4. Gerrie Kincaid;

5. Nurse at KMC (name unknown).

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

**SPECIAL INTERROGATORY NO. 21:**

Please state all facts RELATING TO YOUR sixth cause of action for violation of The Bane Civil Rights Act against the City of Bakersfield as set forth in YOUR COMPLAINT.

**RESPONSE NO. 21:**

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant City of Bakersfield instructed and allowed its employees, more specifically Officers Coleman and McCarthy to detain, arrest and then book me knowing I had not committed a crime and without reasonable suspicion.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 22:

Please state all facts RELATING TO YOUR sixth cause of action for violation of The Bane Civil Rights Act against Verion Coleman as set forth in YOUR COMPLAINT.

## RESPONSE NO. 22:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer Coleman detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 23:

Please state all facts RELATING TO YOUR sixth cause of action for violation of The Bane Civil Rights Act against Anthony McCarthy as set forth in YOUR COMPLAINT.

## RESPONSE NO. 23:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

Defendant Officer McCarthy detained, arrested and then booked me knowing I had not committed a crime and without reasonable suspicion of such.

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

## SPECIAL INTERROGATORY NO. 24:

Please IDENTIFY all PERSONS with knowledge RELATING TO YOUR sixth cause of action for violation of The Bane Civil Rights Act against the City of Bakersfield as set forth in YOUR COMPLAINT.

## RESPONSE NO. 24:

Objection. As to the extent that this interrogatory inquires into oral or written communication between plaintiff's attorneys or their agents and persons contacted in trial

preparation, this interrogatory violates the work-product privilege and/or attorney client privilege which plaintiff and counsel presently refuse to waive. Without waiving said objection, Plaintiff responds as follows:

1. Defendant Officers;

2. BPD Detective Galland;

3. Tina Williams;

4. Gerrie Kincaid;

5. Nurse at KMC (name unknown).

Discovery and investigation are continuing and incomplete. Plaintiff reserves the right to use any information subsequently obtained through discovery and investigation.

Dated: October 6, 2015                    RODRIGUEZ & ASSOCIATES


                                          /s/ Chantal A. Trujillo
                                          Chantal A. Trujillo
                                          Attorneys for Plaintiff

# VERIFICATION (STANDARD) CCP 446, 2015.5

## KENT WILLIAMS, et al. v. CITY OF BAKERSFIELD, et al.

### United States District Court Case No.: 1:14-CV-01955-JLT

I declare that:

I am the Plaintiff in the above-entitled action; I have read the foregoing: PLAINTIFF'S RESPONSE TO SPECIAL INTERROGATORIES, PROPOUNDED BY DEFENDANT CITY OF BAKERSFIELD, SET ONE, and know the contents thereof; the same is true of my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed on

_6/7/15_____,                 at_____Bakersfield_____, California
(Date)                                           (Place)


_____Kent Williams_____                 _____
(Type or Print Name)                             (Signature)

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF KERN

I am employed in the County of Kern, State of California. I am over the age of 18 and not a party to the within action; my business address is 2020 Eye Street, Bakersfield, California 93301

On October 7, 2015, I served the foregoing document described as follows: PLAINTIFF, KENT WILLIAM'S RESPONSE TO SPECIAL INTERROGATORIES, (SET ONE)

\_\_\_\_ by placing the true copies thereof
\_X\_ by placing the original

addressed as follows:     **SEE ATTACHED SERVICE LIST**

 _X_   **BY MAIL** - I enclosed such document in a sealed envelope and caused such envelope to be deposited in the mail at Bakersfield, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with this firm's practice of collection and processing of correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

\_\_\_\_ **BY OVERNIGHT DELIVERY** - I enclosed such document in a sealed envelope and caused it to be deposited in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person.

\_\_\_\_ **BY FACSIMILE** - I caused such document to be transmitted to a facsimile machine maintained by the person on whom it is served at the facsimile machine telephone number as last given by that person.

\_\_\_\_ **BY PERSONAL SERVICE** - I enclosed such document in a sealed envelope and caused it to be delivered by hand to the offices of the addressee(s).

Executed on October 7, 2015 at Bakersfield, California.

 X  (Federal)    I declare under penalty of perjury under the laws of the United States that the above is true and correct.

JENNIFER CRUZ

Michael G. Marderosian, Esq.      **ATTORNEYS FOR DEFENDANTS:**
Heather S. Cohen, Esq.      **CITY OF BAKERSFIELD,**
MARDEROSIAN, CERCONE      **OFFICER COLEMAN, and OFFICER,**
& COHEN      **McCARTHY**
1260 Fulton Mall
Fresno, CA 93721


Virginia Gennaro, Esq.      **ATTORNEY FOR DEFENDANTS:**
City Attorney      **CITY OF BAKERSFIELD,**
CITY OF BAKERSFIELD      **OFFICER COLEMAN, and OFFICER,**
1501 Truxtun Avenue      **McCARTHY**
Bakersfield, CA 93301